Strafford
No. 79-457

MAUREEN WALLACE, INDIVIDUALLY
AND
AS ADMINISTRATRIX FOR THE ESTATE OF
BABY BOY WALLACE & a.

v.

ROBERT M. WALLACE

October 2, 1980

*Burns, Bryant, Hinchey, Cox & Shea*, of Dover (*Paul R. Cox* orally), for the plaintiffs.

*Fisher, Parsons & Moran*, of Dover (*Edward T. Clancy* orally), for the defendant.

GRIMES, C.J. The issue in this interlocutory transfer without ruling by *Mullavey*, J., is whether a death action may be

maintained under RSA 556:11 on behalf of an aborted nonviable fetus.

On January 27, 1978, the plaintiff was a passenger in a motor vehicle being driven by the defendant. Through the defendant's alleged negligence, the vehicle left the road, colliding with a telephone pole. The plaintiff claims to have received personal injuries; she further asserts that the accident caused injury to, and the death of, the male fetus that she was carrying, then 10 to 12 weeks old. The plaintiff, having been appointed administratrix of the estate of the fetus, seeks to maintain this action under RSA 556:11.

Relying on dictum in *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249 (1957), the defendant claims that the plaintiff must prove that the fetus was viable at the time of the accident in order to maintain the action. In *Poliquin* it was decided that if the fetus was viable at the time of the accident and was thereafter stillborn, a death action would lie under RSA 556:11. The court stated, however, that "if a fetus is non-viable at the time of injury and dies in the womb, its representative can maintain no action." 101 N.H. at 107, 135 A.2d at 251.

In *Bennett v. Hymers*, 101 N.H. 483, 147 A.2d 108 (1958), we held that a child born alive could maintain an action for injuries received before birth without regard to viability at the time of the injury. The plaintiff infers from this that because both nonviable and viable fetuses have causes of action following live birth for injuries prior thereto, there should be no distinction based on viability governing the applicability of RSA 556:11. She concludes that an action for death should be maintainable regardless of the fetus' viability.

■ The plaintiff's argument is fatally flawed. In *Bennett*, the court considered not the cause of action of an unborn fetus, but rather that of a live person, maintaining an action in his own behalf, for injuries from which he then suffered. In that context, viability at the time of injury was irrelevant because the live person was presently suffering from the injuries. *Bennett* allowed a cause of action for injuries inflicted before birth which resulted in suffering to the living being after birth; it recognized no such action on behalf of a nonviable fetus never born alive.

Plaintiff's argument that it is a "gross inequity" to hold a tortfeasor liable for injuring a nonviable fetus but not for killing one fails for the same reason. *Bennett* allowed a cause of action because of the injury to the living being after birth and not on behalf of a nonviable fetus never born alive.

Although it is true that at common law, the existence of a child *en ventre sa mere* was recognized for some purposes, all such rights conferred were contingent upon live birth. The fetus took nothing and had no rights as a fetus. It was only the prospective child if born alive which could enforce and enjoy the rights. All such rights terminated if the fetus aborted or was stillborn. *Hogan v. McDaniel*, 204 Tenn. 235, 319 S.W.2d 221 (1958); *Endresz v. Friedberg*, 301 N.Y.S.2d 65, 248 N.E.2d 901 (1969); 4 TIFFANY, REAL PROPERTY (3rd ed.) § 1127, p. 675. *Bennett v. Hymers*, 101 N.H. 483, 147 A.2d 108 (1958), is consistent with the common law in this respect because it deals with those who are born alive and live in the real world even though the injury occurred before birth. Nowhere, however, did the common law give a fetus a cause of action or any other right.

The plaintiff argues that making recovery for the negligent killing of a human fetus contingent on viability constitutes an artificial and unworkable distinction, no longer justifiable in the light of modern medical knowledge and enlightened thought. She argues that the distinction originated as a means of extending protection to the fetus to avoid the consequences of the common-law view that the unborn child was part of the mother, and thus incapable of a separate cause of action, whether born alive or not. *See, e.g., Dietrich v. Inhabitants of Northampton*, 138 Mass. 14 (1884). The viability theory arose out of the logic that since a viable fetus could, with proper care from others, survive and live apart from the mother, it was not part of the mother and could therefore maintain a separate action on its own behalf for prenatal injuries. *Toth v. Goree*, 65 Mich. App. 296, 237 N.W.2d 297 (1975); *Smith v. Brennan*, 31 N.J. 353, 157 A.2d 497 (1960). Neither of these cases relied upon by the plaintiff, however, holds that a death action may be maintained on behalf of a nonviable fetus.

The viable-nonviable distinction was made as part of the never-ending effort to widen more and more the circle of liability which surrounds us. As with all such efforts, the pressure never ends. When a new line is drawn, the pressure shifts to form a new and wider circle. Years ago, few if any would have foreseen that the circle would include a viable fetus. Who can foresee what the next step would be if the circle were to include the nonviable fetus. If life is not to become intolerable, there must be some boundaries to the zone of liability. Neither logic nor science is the determining factor. It is the policy of the law which must establish a reasonable limitation on liability. In our opinion, it is not reasonable to extend liability to a nonviable fetus.

We acknowledge that the purpose of the viable-nonviable distinction was to circumvent the common-law rule barring recovery for all prenatal injuries whether or not the child was born alive. *See, e.g., Smith v. Brennan, supra* at 367-68, 157 A.2d 504-05. It does not follow, however, that a death action should be allowed for a nonviable fetus which aborts. Conceding that there may be no logical distinction based on the viability of the fetus insofar as the existence of a separate life is concerned, the distinction is still valid insofar as it relates to the ability to keep the fetus alive separate and apart from the mother. *See Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 63-64 (1976).

The plaintiff places much reliance upon the argument that doing away with the viability distinction will simplify the judicial task. Were simplicity our major concern, however, it would be facilitated by disallowing death actions on behalf of any stillborn fetus, an approach not without merit. We have recently reiterated that actions for wrongful death are creatures of statute, unknown to common law. *Hebert v. Hebert*, 120 N.H. 369, 415 A.2d 679 (1980). In referring to death, the legislature intended the ordinary meaning of death. The ordinary meaning of death presupposes live birth. Regardless of the philosophical, theological or medical theories of when life begins, we are dealing here with legal causes of action created by legislative act and it can be persuasively argued that death, as used in that act, means the death of a person who has been born alive. *See Presley v. Newport Hospital*, 117 R.I. 177, 193, 365 A.2d 748, 756 (1976) (*Kelleher*, J., dissenting).

Death actions on behalf of the aborted benefit only the parents and benefit the fetus not at all. Nor can it be determined, except by sheer speculation, that there is any economic loss to its estate or to the parents, who alone would benefit from such a cause of action. RSA 556:14, 561:1 II(b). This would be in addition to the cause of action the prospective mother has for her injuries, including the miscarriage. It is misleading, therefore, to refer to the rights of the fetus as the plaintiff does. *See Justus v. Atchison*, 19 Cal. 3d 564, 565 P.2d 122 (1977). Whether a fetus is a person from the moment of conception and whether life begins with conception in the medical, philosophical or theological sense is irrelevant to the issue before us. The real question is not when life begins but, rather, whether our death statute should be construed to allow a cause of action on behalf of a fetus that has not drawn a breath of air, seen the light of day, or possessed the capacity to survive in the world outside its mother, despite all the medical and

other care that could be mustered for it. To deny a nonviable fetus a cause of action is not to deny that life begins with conception. It is simply a policy determination that the law will not extend civil liability by giving a nonviable fetus a cause of action for negligence before it becomes a person, in the real and usual sense of the word, by being born alive. In other words, life may begin with conception but causes of action do not. We hold that no independent cause of action for wrongful death lies on behalf of a nonviable fetus that never achieves live birth.

The fact that the legislature has done nothing since the *Poliquin* decision is of no relevance to the issue in this case and would also be of little aid in any consideration whether *Poliquin* should be overruled, because the legislature speaks by action and not by inaction. *Merrill v. Manchester*, 114 N.H. 722, 332 A.2d 378 (1974). Moreover, the legislative inaction, even if considered, reflects on the disallowance of an action on behalf of the nonviable fetus aspect of the *Poliquin* opinion as much as it does on the other part. Thus, if we considered the inaction as approval of the holding in *Poliquin*, which we do not, we would also consider it an approval of the strong and definite statement that no action can be maintained on behalf of a nonviable fetus not born alive.

We remark also in passing that it would be incongruous for a mother to have a federal constitutional right to deliberately destroy a nonviable fetus, *Roe v. Wade*, 410 U.S. 113 (1973), and at the same time for a third person to be subject to liability to the fetus for his unintended but merely negligent acts. *See Toth v. Goree*, 65 Mich. App. 296, 237 N.W.2d 297 (1975).

It is neither necessary nor proper for us to consider in this case whether *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249 (1957), was wrongly decided. It is sufficient to say in this case that we will not enlarge the rule of that case to provide a wrongful death action to the estate of a fetus not viable at the time of injury.

The plaintiff lastly asserts that if recovery for the wrongful death of an unborn fetus is found by this court to depend on whether it was viable at the time of the injury, the determination of that issue is for the jury and cannot be decided as a question of law by the trial court. *See, e.g., Green v. Smith*, 71 Ill. 2d 501, 377 N.E.2d 37 (1978); *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 331 N.E.2d 916 (1975).

We agree with the plaintiff that, ordinarily, the question of viability is one for the trier of fact. *Green v. Smith supra; Mone v. Greyhound Lines, Inc. supra.* We agree that the point at which a fetus becomes viable is highly uncertain and that advances in

medical technology will continue to move the point of viability closer to conception. Nevertheless, we decline to accept the logic that viability can never become a question of law.

As the United States Supreme Court noted in *Roe*, "[v]iability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." 410 U.S. at 160. Though, in a more recent case, the Court may have indicated that viability sometimes occurs even earlier, we know of no indication that such is the case within the first trimester of pregnancy. *See Planned Parenthood of Missouri v. Danforth*, 428 U.S. at 63-64. Here the parties agree that the fetus was of no more than 10 to 12 weeks gestation at the time of the alleged injury. Under these circumstances, a jury would not be entitled to find that the plaintiff's stillborn was viable in the sense of being "potentially able to live outside the mother's womb." *Id.* at 64, *quoting Roe v. Wade*, 410 U.S. at 160; *see Toth v. Goree supra*. On these agreed facts, we rule, as a matter of law, that the fetus was nonviable.

*Appeal dismissed.*

DOUGLAS, J., dissents; the others concur.

DOUGLAS, J., dissenting: Relying on dictum in *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249 (1957), the defendant claims that the plaintiff must prove that the boy's life had progressed to the stage of viability at the time of the accident in order to maintain the action. In *Poliquin*, we decided that if a fetus was viable at the time of the accident and was thereafter *stillborn*, a death action *would* lie under RSA 556:7, 9-14.

> "We are . . . of the opinion that a fetus having reached that period of pre-natal maturity where it is capable of independent life apart from its mother is a *person* and if such *child* dies in the womb as the result of another's negligence, an action for recovery may be maintained in its behalf." (Emphasis added.)

101 N.H. at 107, 135 A.2d at 251. The court stated, however, that "if a fetus is non-viable at the time of injury and dies in the womb its representative can maintain no action." *Id.*

In *Bennett v. Hymers*, 101 N.H. 483, 147 A.2d 108 (1958), we held that a child born *alive* could maintain an action for injuries received before birth *without* regard to viability at the time of the injury. In that context, viability at the time of injury was

irrelevant because the person was presently suffering from the pre-natal injuries. The plaintiff asserts that because both nonviable and viable fetuses have causes of action following live birth for injuries prior thereto, there should be no distinction based on viability governing the applicability of RSA 556:12 in cases where the child is stillborn and thus asks us to repudiate the dictum in *Poliquin supra.*

"The common law has always been most solicitous for the welfare of the fetus in connection with its inheritance rights as well as protecting it under the criminal law." *Poliquin, supra* at 107, 135 A.2d at 251. The property rights of the later born child are as old as the common law itself. Blackstone has stated:

> "An infant *in* [*sic*] *ventre sa mere*, or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate, made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born. And in this point the civil law agrees with ours."

W. BLACKSTONE, COMMENTARIES* 130. *See, e.g., Wallis v. Hodson,* 26 Eng. Rep. 472 (Ch. 1740); *Marsh v. Kirby,* 21 Eng. Rep. 512 (Ch. 1634); and RSA 551:10.

As this court noted in *Bennett:*

> ". . . we find it difficult to see the logic which would recognize a child's legal existence while *en ventre sa mere* with respect to property rights and rights of inheritance (4 Tiffany, Real Property (3d ed.) s. 1127, p. 391) and also in the field of criminal law . . . and yet would deny it recognition so as to afford it protection against the torts of others."

101 N.H. at 485, 147 A.2d at 110.

That illogic in the field of *torts* was especially noted in the common-law theory that if a person was injured and died due to the injury, his "case died with him." Thus, if negligent acts were committed against someone's person so as to break his arm he could recover from the tortfeasor, but if the tortfeasor killed the plaintiff, he was "home free." No one ever asserted that adults were not "persons" because they had to survive the injury to sue. The illogic of the tort rule led to the passage of "wrongful death"

or "survivor" acts, such as the act at issue in this case, RSA 556:12. *See Hebert v. Hebert,* 120 N.H. 369, 415 A.2d 679 (1980).

The majority asserts that a cause of action for an aborted child "benefits only the parents." That principle also is valid if applied to the death of a fourteen-year-old child or an elderly person with no living relatives. Our legislature has recognized that human life should not be wrongfully taken and that *everyone* is worth "something." *See* RSA 556:13.

In *Poliquin* this court chronicled the tort law evolution leading up to the holding in that case that turned on the viable/nonviable distinction for stillborn infants. At common law, most distinctions, especially with regard to homicide, related to whether the child in the womb was "quick." That old English word separated humanity into "the quick and the dead." *See* THE OXFORD UNIVERSAL DICTIONARY 1640 (3d ed. rev. 1955). With regard to the carrying of a child in the womb, "quickening" is subjective and merely means that the mother feels the child moving within her. It varies from mother to mother but will usually range from three to five months. *See* authorities cited in Byrn, *Abortion-on-Demand: Whose Morality?* 46 NOTRE DAME LAWYER 5, 9–12 (1970) (hereinafter Byrn). The seventeenth century medical technology did not allow for a more sophisticated segmenting especially in the criminal law abortion-murder statutes. *Id.* at 10-11.

"Viability", on the other hand, is what medical science in the last century established ás the stage of life when an infant was said to be capable of existence apart from its mother. *See Woods v. Lancet,* 303 N.Y. 349, 357, 102 N.E.2d 691, 695 (1951). The trouble with this as a guidepost is that it turns upon the ever-changing progress in the field of medical science. Indeed, ten years ago it was noted that with "recent advances in technology, viability has been pushed back from the twenty-eighth to the twentieth week of pregnancy." Byrn, *supra* at 12. As one observer put it:

> "In this day of DNA synthesis, test-tube incubation, intra-uterine transfusions, talk in high circles of chromosomal manipulation and *in vitro* generation, the 20-week survivability standard is about as sacred as the four-minute mile." Byrn, *supra* at 13, *quoting* Diamond, *Humanizing the Abortion Debate, America,* July 19, 1969, at 36-37.

Within this last year of "test-tube" babies and "cloning", the United States Supreme Court has even dealt with the esoteric question of whether a live human-made micro-organism is

patentable. *Diamond v. Chakrabarty*, 100 S. Ct. 2204 (1980).

Several years ago, Dean Prosser pointed out that medical authority has long recognized that a child is in existence from the "moment of conception" and that "the unborn child in the path of an automobile is as much a person in the street as the mother." W. PROSSER, HANDBOOK OF THE LAW OF TORTS 336 (4th ed. 1971). *Accord* 42 AM. JUR. 2d *Infants* § 2 (1969). This court, twenty-two years ago in *Bennett*, clearly said:

> "We adopt the opinion that the fetus from the time of conception becomes a separate organism and remains so throughout its life."

101 N.H. at 485, 147 A.2d at 110. That conclusion is even more valid today.

> "The unborn child is not a part of the mother. The organs and the blood of the child are his own, and at six weeks the features of his face—a human face—are discernible. Even the belief that the placenta was part of the mother has been proven to be false. The child is 'neither a quiescent vegetable nor a witless tadpole, as some have conceived him to be in the past, but rather a tiny human being, independent as though he were lying in a crib with a blanket wrapped around him instead of his mother.' 'The fertilized egg . . . grows and develops into an embryo, a fetus, an infant, a youngster, an adolescent, an adult, an oldster, and, finally a cadaver.' 'Birth is not a beginning. . . . It is more nearly a bridge between two stages of life.' It is as irrational to choose birth, quickening, or viability as the point at which life is to be legally protected as it is to choose the age of six months, seven years, or the age of adult majority as the Roman law essentially did." Note, *The Law and the Unborn Child: The Legal and Logical Inconsistencies*, 46 NOTRE DAME LAWYER 349, 371 (1971) [hereinafter *The Law and the Unborn Child*].

The law has progressed far since the time when children could even intentionally be killed by their parents. Infanticide was made a crime for the first time in Rome in 318 A.D. *Id.* at 371 n.163. *See* RSA 639:5. Today, at least sixteen states recognize that a civil cause of action may exist for either the father or the mother when a child is stillborn, because it is a "person." *See The Law and the Unborn Child* at 359 n.76 and cases cited therein.

The majority concludes that by "death" of a "person" in RSA ch. 556 the legislature did not contemplate children in the status of a fetus. It has, however, been a long twenty-two years since we held in *Poliquin* that, for purposes of RSA ch. 556, viable fetuses are "persons" even if stillborn. Today we should discard our legislatively undisturbed and judicially-created "viability" distinction in *Poliquin. See Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976).

> "The courts seem to be moving toward granting recovery where a non-viable child is injured and subsequently is born dead. This is the 'last frontier' for the unborn child in the law of tort recovery. . . . The purpose of wrongful death statutes is to protect human life, and they will not be completely effective until an action can be maintained for the wrongful taking of any life no matter how young or how old." Hartye, *Tort Recovery for the Unborn Child*, 15 JOURNAL OF FAMILY LAW 276, 299 (1976–1977).

I am aware that the United States Supreme Court in one area of the law has chosen to impose upon the states a controversial judicial edifice based upon the so-called "viability" and trimester model (a model that may rapidly become scientifically untenable). In *Roe v. Wade*, 410 U.S. 113, *reh'g denied*, 410 U.S. 959 (1973), a majority of that Court chose to speak only of "potential" life and said a state's important interest in the intentional abortion field only reaches the "compelling" point at the second, or "viability," stage. *Id.* at 161-63. As that Court noted in *Roe*, "[v]iability is usually placed at about seven months (28 weeks) but may occur earlier, even at 24 weeks." *Id.* at 160. Yet recently, the Court placed "viability" as "usually in the third trimester." *See Harris v. McRae*, 100 S. Ct. 2671, 2686 (1980) (upholding the Hyde Amendment). We should not segment life into "trimesters" any more than into changing or transient demarcations based upon "viability" or "quickening."

In whatever manner the United States Supreme Court chooses to define "persons" for fourteenth amendment purposes, it is *not* binding on this court with regard to RSA ch. 556 death actions. We have clearly opted as a state for "the opinion that the fetus from the time of conception becomes a separate organism and remains so throughout its life." *Bennett, supra* at 485, 147 A.2d at 110. The majority unsuccessfully tries to dance around that earlier decision of this court by saying on one hand "the law will not extend civil liability for negligence to . . . [the child] by giving it a

cause of action until it becomes a "person" by "being born alive" while at the same time not overruling *Poliquin* or the *Bennett* language. Even at eight weeks the unborn child

> "has a pumping heart with fully deployed blood vessels and has all other internal organs. The face is completely formed, and the arms, legs, hands, feet, toes and fingers are partially formed. The fetus will react to tickling of the mouth or nose, and there is readable electrical activity coming from the brain (citations omitted)."

Byrn, *supra* at 8. If death is defined as the irreversible cessation of spontaneous heart and circulatory pulsation in a person, HALLEY & HARVEY, *Medical v. Legal Definitions of Death,* 204 J. AM. MED. A. 423 (1968), we had life in the case of Baby Boy Wallace.

I recognize, as we did in *Bennett,*

> "that the problem of proving causal connection between the injury and the accident increases as injury occurs earlier in gestation. However difficulty of proof should not bar recovery for a wrong if the evidence meets the usual tests required in tort cases."

101 N.H. at 486, 147 A.2d at 110.

For purposes of RSA ch. 556, I would join the Rhode Island Supreme Court in concluding that life is life and people are people by discarding the outmoded and improper "viability" distinction. *See Presley v. Newport Hospital supra.*