Julius & Yulanda RAMBO,
Plaintiffs–Appellants,

v.

Bill LAWSON and Carl's Car Service,
Defendants–Respondents.

No. 72803.

Supreme Court of Missouri,
En Banc.

Nov. 20, 1990.

Rehearing Denied Dec. 18, 1990.

Stanley Wiles, Kansas City, for plaintiffs-appellants.

Michael E. McCausland, Sylvester Powell, Jr., Kansas City, for defendants-respondents.

BLACKMAR, Chief Justice.

By the allegations of the petition, which we accept as true for present purposes, the plaintiff Julius Rambo was driving and the plaintiff Yulanda Rambo was riding in an automobile which collided with a vehicle driven by the defendant Lawson. The accident occurred March 6, 1987. Yulanda was three months pregnant at the time of the accident and suffered a miscarriage. The Rambos sued Lawson and Carl's Car Service under § 537.080, RSMo 1986, charging negligence and seeking damages for the wrongful death of their unborn child.[1] The trial court dismissed the action. The Court of Appeals, Western District, reversed by 2 to 1 vote, with well researched and well crafted majority and dissenting opinions. We granted transfer to consider the unique features of the case. We affirm the trial court's order of dismissal.

It is not asserted in the petition that the 3–month old fetus was capable of continued existence outside the womb at the time of the miscarriage. The question we must decide is whether a non-viable fetus is a person within the meaning of the first paragraph of § 537.080, RSMo 1986, reading as follows:

Whenever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof, the person or party who, or the corporation which, would have been liable if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured, ...

\*   \*   \*   \*   \*   \*

That is the sole question involved in this case.

In *O'Grady v. Brown*, 654 S.W.2d 904 (Mo. banc 1983), we held that the parents of a stillborn child could recover damages for wrongful death allegedly caused by the negligence of the attending obstetrician. There we overruled the rather recent case of *State ex rel. Hardin v. Sanders*, 538

---

1. The legal file shows that separate lawsuits were filed by Yulanda for her personal injuries

and by Julius for his injuries arising out of the accident.

S.W.2d 336 (Mo. banc 1976), concluding that there was little reason for distinguishing an action for the death of a viable fetus from the situation involved in *Steggall v. Morris*, 363 Mo. 1224, 258 S.W.2d 577 (1953), in which a child was born alive but subsequently died as the result of prenatal injuries. In so holding, we followed the developing weight of authority. In *O'Grady* we expressed the caution that "We ... do not decide whether the same action would lie for the death of a nonviable fetus." *O'Grady*, 654 S.W.2d at 911. To allow the action, then, it would be necessary to go beyond *O'Grady*.

We are dealing with a statute. The wrongful death statute has long been a part of our law. It has received frequent legislative attention, and has existed in its present form since 1979. We must always bear in mind, however, that we are construing a statute, and must proceed within the framework of the legislative purpose as we perceive it. We must also bear in mind Justice Holmes's observation about drawing lines, expressed in *Irwin v. Gavit*, 268 U.S. 161, 168, 45 S.Ct. 475, 476, 69 L.Ed. 897 (1925), as follows:

> Neither are we troubled by the question where to draw the line. That is the question in pretty much everything worth arguing in the law.

We do not believe that the legislative purpose would be served by an extension of the *O'Grady* holding to cover this situation. Nor do we have to express a conclusion on the continuing viability of *O'Grady* in order to decide this case.

We base our conclusion on several reasons: (1) there is always uncertainty and speculation about whether a pregnancy will culminate in a live birth, and the uncertainty is greater during the early part of the term; (2) the mother has her own action for negligently inflicted injury, in which the circumstances of her pregnancy and miscarriage may be brought out and considered as part of the intangible damages;[2] (3) the father has an action for loss of the mother's services, in which the jury may consider such psychological problems as she may have sustained on account of the accident; (4) fertile parents may conceive another child, and any damage to reproductive capacity may be compensated in the parents' actions. We do not believe that it is necessary to extend the definition of "person" beyond the *O'Grady* standard in order to serve the purposes of the wrongful death statute, or to compensate the plaintiffs adequately for their loss.

Mention is made of § 188.015(6), RSMo 1986, reading as follows:

> Unless the language or context clearly indicates a different meaning is intended, the following words or phrases for the purpose of sections 188.010 to 188.130 shall be given the meaning ascribed to them:
>
> \*     \*     \*     \*     \*     \*
>
> (6) "Unborn child", the offspring of human beings from the moment of conception until birth and at every stage of its biological development, including the human conceptus, zygote, morula, blastocyst, embryo, and fetus;
>
> \*     \*     \*     \*     \*     \*

and also of § 1.205:

> 1. The general assembly of this state finds that:
>
> (1) The life of each human being begins at conception;
>
> (2) Unborn children have protectable interests in life, health, and well-being;
>
> (3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.
>
> 2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of the United States, and decisional interpretations

---

**2.** *Ivy v. Wal–Mart Stores, Inc.*, 777 S.W.2d 682, 684–85 (Mo.App.1989); 84 A.L.R. 460 § 9. *See also State ex rel. Hardin v. Sanders*, 538 S.W.2d 336, 340 (Mo. banc 1976), *overruled on other grounds, O'Grady v. Brown*, 654 S.W.2d 904 (Mo. banc 1983).

thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state.

3. As used in this section, the term **"unborn children"** or **"unborn child"** shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development.

4. Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

These statutes were included in the text of S.C.S.H.B. 1596, L.1986, pp. 689–694, which was a bill designed to regulate abortions. This purpose is explicitly stated in § 188.010, RSMo 1986.[3] *See Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). We find no indication in the text that this bill was designed to amend the wrongful death statutes, which the legislature could easily have done had such been its intention.

Other provisions of the bill show that the legislators were very aware of matters of civil liability. Section 188.028.2(4) confers immunity from suit by parents of a minor on whom an abortion is performed by court authority. Section 188.120 creates a cause of action for an employee who suffers discrimination because of refusal to assist in an abortion. Section 188.130 eliminates the so-called "wrongful life" actions. Section 5 gives taxpayers standing to sue if public funds are used for abortions. It is reasonable to assume that the legislature would have dealt specifically with the application of S.C.S.H.B. 1596 for wrongful death actions, if it had intended that there be such applications, or if it had intended that *O'Grady* be extended.

Subsection 2 of Section 1.205, of course, did not become operative by its terms until after the accident took place and so could not affect the substantive law governing the plaintiffs' claim. Other portions of S.C. S.H.B. 1596 are not so limited.[4] *See* Mo. Const. art. III, § 29 (effective date of laws). The plaintiffs rely on all of the quoted portions in their argument, and so it is necessary to consider the applicability of the other portions of the statute.

The issue before us has had the attention of numerous courts, construing wrongful death statutes. The plaintiffs' position seems to be supported only by *Presley v. Newport Hospital,* 117 R.I. 177, 365 A.2d 748 (1976). Other cases which would allow an action for the death of a viable fetus do not allow an action for the death of a nonviable one. *Humes v. Clinton,* 246 Kan. 590, 792 P.2d 1032 (1990); *Oswald v. LeGrand,* 453 N.W.2d 634 (Iowa 1990); *Wallace v. Wallace,* 120 N.H. 675, 421 A.2d 134 (1980); *Rice v. Rizk,* 453 S.W.2d 732 (Ky.1970); *State v. Sherman,* 234 Md. 179, 198 A.2d 71 (1964); *White v. Yup,* 85 Nev. 527, 458 P.2d 617 (1969); *Fowler v. Woodward,* 244 S.C. 608, 138 S.E.2d 42 (1964); *Kwaterski v. State Farm Mut. Automobile Ins. Co.,* 34 Wis.2d 14, 148 N.W.2d 107 (1967); *Coveleski v. Bubnis,* 391 Pa.Super. 409, 571 A.2d 433 (1990) *citing Amadio v. Levin,* 509 Pa. 199, 501 A.2d 1085 (1985). Annot., 84 A.L.R.3d 411, 422 §§ 3, 4. *Cf. Kalafut v. Gruver,* 239 Va. 278, 389 S.E.2d 681 (1990); *see also* 84 A.L.R. 453 § 5[a]. Thus our decision is in line with the weight of authority.

The judgment of dismissal is affirmed.

HIGGINS and BILLINGS, JJ., concur.

ROBERTSON, J., concurs in result in separate opinion filed.

---

3. Section 188.010, RSMo 1986, reads as follows:

It is the intention of the general assembly of the state of Missouri to grant the right to life to all humans, born and unborn, and to regulate abortion to the full extent permitted by the Constitution of the United States, deci- sions of the United States Supreme Court, and federal statutes.

4. The bill repeals ten statutory sections and enacts twenty new sections in three chapters of the revised statutes. Only the one subsection has an expressed delayed effective date.

COVINGTON, J., concurs in result and concurs in concurring in result opinion of ROBERTSON, J.

HOLSTEIN, J., dissents in separate opinion filed.

RENDLEN, J., dissents and concurs in dissenting opinion of HOLSTEIN, J.

ROBERTSON, Judge, concurring in result.

I concur in the result reached in the principal opinion. I cannot join the principal opinion. I believe that *O'Grady v. Brown*, 654 S.W.2d 904 (Mo. banc 1983), is incorrect. On the rationale employed by the principal opinion in this case *O'Grady* should be overruled. Yet the principal opinion fails to do so, choosing to follow its own preferred policy instead of adhering to sound jurisprudential tools.

### I.

This case is a case of statutory construction. This is so because the common law knew no action for wrongful death. *Frazee v. Partney*, 314 S.W.2d 915, 918 (Mo. 1958). Because the common law did not permit an action for wrongful death, the wrongful death statute is in derogation of the common law. When the legislature creates a cause of action in derogation of the common law, that cause of action is limited to the grant of authority set out in the statute. *See Simpson v. Kilcher*, 749 S.W.2d 386, 389–91 (Mo. banc 1988). The statute is not subject to judicial expansion.

The principal opinion tells us that "[w]e must always bear in mind, however, that we are construing a statute, and must proceed within the framework of the legislative purpose as we perceive it." (Maj. op. at 63). The statement sounds correct; it is not.

The notion of a framework assumes a freedom to operate within boundaries. We have no license to wander freely within a statutory framework to find a policy we prefer. Our decisions, if we are to be a court of law and not an unelected and unaccountable superlegislature, must reflect the intent of the General Assembly, the branch of government which properly makes laws under our constitution. That intent is found in the words used by the legislature in establishing the cause of action. And in construing the words of a statute, we assume that the legislature is aware of the decisions of the courts when it chooses to use the words it uses. *Citizens Electric Corp. v. Director Of the Department of Revenue*, 766 S.W.2d 450, 452 (Mo. banc 1989).

In 1976, this Court, without dissent, held that the wrongful death statute prohibited a cause of action for the wrongful death of an unborn fetus. *State ex rel. Hardin v. Sanders*, 538 S.W.2d 336 (Mo. banc 1976). "We think the legislature in enacting the original act and subsequent revisions did not intend to create an action for the death of a fetus never born alive. In view of the common law rule that an unborn fetus is not a 'person' we think if there had been an intention to create such an action it would have been specifically so stated." *Id.* at 338–39.

In 1979, three years after *Sanders*, the legislature reenacted the wrongful death statute. Again, the legislature used the word "person;" it did not define "person" to have any meaning other than that held by *Sanders*. The wrongful death statute has not been amended since 1979.

In 1983, this Court decided *O'Grady*. The decision in that case rests on a judicial finding that the meaning of the word "person" in the wrongful death statute, reenacted after *Sanders*, had changed. *O'Grady* stripped of its rhetoric, is no more than a judicial amendment of the wrongful death statute. In my view, *O'Grady* is not correct.

The result reached by the principal opinion is correct for precisely the reason *O'Grady* is incorrect; it is true to the language of the statute. Unfortunately, the Court's adherence to the rule of law in this case is not the product of allegiance to the rule. Instead, the rule of law employed here is no more than a convenient device by which the Court reaches its preferred policy choice; the Court shows, however, by its statements of policy that it would readily

shuck the rule of law to serve its policy directed purpose without remorse. This mindset is betrayed by the Court's reference to decisions of other jurisdictions. Each of those jurisdictions presumably has its own statute and history of judicial interpretation. Unless it can be shown that those are identical to the Missouri experience, the decisions of other states are no more than make weight for an argument that cannot stand on its own.

In sum, and for the reasons expressed, I would overrule *O'Grady* as a predicate for the decision reached in the principal opinion.

## II.

Judge Holstein's dissent is incorrect, I believe, for the same reason *O'Grady* is incorrect. By its acceptance of *O'Grady*, it, too, assumes authority in this Court to alter a statutory cause of action by judicial alteration of the meaning of the legislature's language. This is not to say that Judge Holstein's opinion is not well written or well researched; it is. To the extent that Judge Holstein attempts to make peace with *O'Grady*, he does so not by the subterfuge of policy arguments, but by reference to a common law heritage which the legislature might have accepted but for *Sanders*.

As I have said, however, *O'Grady* is incorrectly decided. Once this Court decided *Sanders*, the legislature is presumed both to have been aware of and acquiesced in the *Sanders* definition of "person" by its re-enactment of the wrongful death statute without change. "[W]here the Legislature, after a statute has received a settled judicial construction by a court of last resort, re-enacts it or carries it over without change or reincorporates the exact language theretofore construed, it must be presumed that the Legislature knew of and adopted such construction." *State ex rel. Smith v. Atterbury*, 364 Mo. 963, 270 S.W.2d 399, 403–04 (banc 1954).[1]

In my view, this is the reason Judge Holstein's dissent misses the mark. The question in this case is not whether viability is a suitable standard for permitting actions under the wrongful death statute. The question in this case is whether the General Assembly intended to permit a cause of action for the death of any unborn child, viable or not. Even if one assumes, arguendo, that Judge Holstein's view of the common law is correct and that *Sanders* is wrong, the General Assembly is presumed to have agreed with the *Sanders* result by its re-enactment of the wrongful death statute without change.

Judge Holstein presumably answers this, saying that there is no room for construction where the language of the statute is without ambiguity. He is of course correct in his statement of the law; but to say that there is no ambiguity in the meaning of the word "person" is a bit disingenuous when the bulk of his dissent is dedicated to unraveling the difficulty courts have faced in determining the meaning of that very word.

I concur in result only.

COVINGTON, J., concurs.

HOLSTEIN, Judge, dissenting.

I respectfully dissent.

The viability standard, relied on by two members of the majority as the time when a fatal injury to a fetus gives rise to a wrongful death action, is arbitrary, unworkable and the outgrowth of a fundamental misunderstanding of generally accepted scientific facts. Viability should be rejected as a standard for determining whether a fetus is a "person" in the context of our wrongful death statute.

At the outset it is important to note that this case is not controlled by the cases involving a pregnant woman's "right of privacy." In this case, the rights of the expectant mother and the rights of the fetus are parallel and not in conflict. An examination of the history of the law relating to tort causes of action for negligent infliction of prenatal injury begins well be-

---

**1.** I assume, and apparently Judge Holstein does not, that when this Court has spoken without

dissent on a question of Missouri law, the issue is settled.

fore *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

The great Judge (later Justice) Holmes, writing for the Massachusetts Supreme Judicial Court, was the first American to author an opinion on the subject of prenatal injury. *Dietrich v. Inhabitants of Northampton*, 138 Mass. 14 (1884). A woman four months pregnant had fallen on a defective highway, causing the premature birth of an infant. The child was delivered alive but, due to its prematurity, died within minutes. The child's estate sued for damages. Holmes rejected arguments based upon Lord Coke's statement of the English common law that, "If a woman is quick with child ... or if a man beats her, and the child is born alive and dies ... of the battery, this is murder." *Id.* at 16–17. Holmes noted that "quick" means some degree of "quasi-independent life" under Massachusetts caselaw. He questioned whether any duty was owed to "one not yet in being," and concluded that "as the unborn child was part of the mother at the time of the injury, any damage to it which was not too remote to be recovered for at all was recoverable by her." *Id.* Recovery by the estate of the premature child was denied.

Holmes was too impressive a figure in judicial circles to be ignored, even though his notion that "a child is part of the mother" was inconsistent with both the common law, which he rejected, and rather clear scientific evidence that the mother and fetus are separate organisms. Nevertheless, Holmes' misapprehensions have continued to confuse and confound American courts as to what constitutes a "person" for purposes of tort recovery.

The concept of viability was invented by Justice Boggs of the Illinois Supreme Court in an effort to avoid the harshness of Holmes' rule in *Dietrich*. The Illinois Supreme Court, relying on *Dietrich*, refused to allow an action for prenatal injuries. *Allaire v. St. Luke's Hosp.*, 184 Ill. 359, 56 N.E. 638 (1900). The majority relied on Holmes' notion that a child is part of the mother's body. Boggs attacked that tenuous rationale:

A foetus in the womb of the mother may well be regarded as but a part of the bowels of the mother during a portion of the period of gestation. Medical science and skill have demonstrated that at a period of gestation in advance of the period of parturition, the foetus is capable of independent and separate life, and that, though within the body of the mother, it is not merely a part of her body, for her body may die in all of its parts and the child remain alive and capable of maintaining life, when separated from the mother. If at that period a child so advanced is injured in its limbs and members and is born into the living world suffering from the effects of the injury, is it not sacrificing truth to a mere theoretical abstraction to say the injury was not to the child, but wholly to the mother?

*Id.* 56 N.E. at 641.

With the notable exception of *Cooper v. Blanck*, 39 So.2d 352 (La.App.1923), published in 1949, Boggs' dissent was to lie dormant for over forty years. By the 1940's, some common law cases began to seek ways to avoid Holmes' harsh result. Boggs' concept of viability was rediscovered. *Bonbrest v. Kotz*, 65 F.Supp. 138 (D.D.C.1946); *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949); *Williams v. Marion Rapid Transit Co.*, 152 Ohio St. 114, 87 N.E.2d 334 (1949); *Mallison v. Pomeroy*, 205 Or. 690, 291 P.2d 225 (1955); *Tursi v. New England Windsor Co.*, 19 Conn.Supp. 242, 111 A.2d 14 (1955). The deadliest blow to Holmes' rule in *Dietrich* came in *Keyes v. Construction Service, Inc.*, 340 Mass. 633, 165 N.E.2d 912 (1960), which overruled *Dietrich*.

The viability standard for determining when a wrongful death action arises for prenatal injury was first addressed by Missouri courts in *Steggall v. Morris*, 363 Mo. 1224, 258 S.W.2d 577 (1953). There, the mother was pregnant with a viable infant and was involved in a vehicle accident. Three days later, the child was born alive but, due to injuries sustained in the collision, lived only eighteen days after being born. This Court, after citing the growing

body of caselaw which rejected the *Dietrich* rule, stated:

> [I]t is not in accordance with the truth to say the law indulges a fiction when it attributes a legal personality to an unborn child ... A number of courts and text writers have reached the same conclusion. We call particular attention to the opinion by Justice McGuire in the case of *Bonbrest v. Kotz, supra,* 65 F.Supp. *loc. cit.* 140(3). The justice there cited many medical authorities to support the statement, "From the viewpoint of the civil law and the law of property, a child *en ventre sa mere* is not only regarded as a human being, but as such from the moment of conception—which it is in fact."

*Id.* 258 S.W.2d at 579. This Court overruled precedent and, relying on the maxim that where there is a wrong there is a remedy, allowed a wrongful death action for "a viable child, injured while *en ventre sa mere,* born alive." The question was not presented in that case as to whether a wrongful death action would lie if the child was stillborn.

The next significant Missouri case was *State ex rel. Hardin v. Sanders,* 538 S.W.2d 336 (Mo. banc 1976). The Court expressed the mistaken view that a common law rule existed "that an unborn fetus is not a person." *Id.* at 339. As will be discussed below, that was not the common law rule. From that erroneous view of the common law, the Court reasoned, "It is our view that a fetus is not a 'person' within the meaning of the wrongful death statute." *Id.* at 338. The Court denied a wrongful death action for fatal injuries to a viable, stillborn fetus. Strangely, *Hardin* did not overrule the holding in *Steggall* that for purposes of the wrongful death act, injury to a fetus was injury to a person. The question was thus left unsettled as to what constitutes a person under the statute.[1]

*Hardin* was perhaps the dying gasp of the *Dietrich* rule. *O'Grady v. Brown,* 654 S.W.2d 904 (Mo. banc 1983), examining the

rationale for *Hardin,* found it out of tune with *Steggall,* as well as the law in most other jurisdictions, and contrary to sound logic. For those reasons, this Court overruled *Hardin* in the *O'Grady* case.

From *O'Grady* and *Steggall* it is clear that this Court has decided that a fetus is a person for purposes of tort recovery under our wrongful death statute. The question is what role, if any, should viability play in determining when the cause of action for wrongful death arises.

Professor Prosser has summarized the problems with utilizing viability:

> [M]edical authority has long since recognized that an unborn child is in existence from the moment of conception, and for many purposes its existence is recognized by the law. It has been accorded legal status for various purposes in equity, criminal law, property law, and tort law ... All writers who have discussed the problem have joined in condemning the total no-duty rule and agree that the unborn child in the path of the automobile is as much a person in the street as the mother, and should be equally protected under the law.
>
> . . . .
>
> The child, if he is born alive, is now permitted in every jurisdiction to maintain an action for the consequences of prenatal injuries, and if he dies of such injuries after birth an action will lie for his wrongful death.
>
> . . . .
>
> [L]ogic is in favor of ignoring the stage at which injury occurs. With recent advances in embryology and medical technology, medical proof of causation in these cases has become increasingly reliable, which argues for eliminating the viability or other arbitrary development requirements altogether.

*Prosser and Keeton on The Law of Torts,* § 55, 367–68 (W. Keeton, D. Dobbs, R. Keeton, and D. Owen 5th ed. 1984).

As noted by Prosser, medical science has progressed in quantum leaps in the last

---

1. The rule of statutory construction relied on in Judge Robertson's opinion predicates its application upon a "settled judicial construction." That rule is inapplicable here.

fifty years. The mother and a living unborn child may be separated at a very early stage of development. Today human embryos may be removed from the uterus of the mother and transferred to a recipient surrogate who is then able to deliver the child at full term. *See Danforth's Obstetrics and Gynecology* at 833–841 (J. Scott, P. DiSaia, C. Hammond, W. Spellacy 6th ed. 1990). From conception onward, the mother and the expected child are separate, living, human organisms having unique genetic qualities. The mother and the child do not share the same cardiovascular, respiratory, digestive, neurological, musculoskeletal, endocrine or urogenital systems. Medical science recognizes a fetus as a separate and distinct human biological entity. *See Williams Obstetrics* at 87–124 (F. Cunningham, P. MacDonald, and N. Gant 18th ed. 1989). With all of these generally recognized principles of science at hand, it is absurd to extend the legal fiction introduced by Holmes and perpetuated by Boggs that an unborn child is "a part of the mother's bowels" until the fetus is viable.

A second and equally strong reason for rejecting viability as the standard for determining the boundaries of a cause of action for wrongful death was discussed by the Missouri Court of Appeals, Western District's, majority opinion in this case authored by Chief Judge Nugent:

> Basing the right to recovery upon the viability of the fetus places the legal basis for recovery for wrongful death upon shifting ground. Medical technology today guarantees the viability of fetuses considered nonviable only a few years ago, and a few years from now, medical technology certainly will keep alive outside the womb fetuses we now regard as nonviable.
>
> . . . .
>
> Except for the superficial differences, what distinguishes a human fetus with functioning but incipient organs from another, a few days or weeks older, with

functioning but slightly more mature organs? We can find no difference that compels us to consider the child in a later stage entitled to greater consideration than an infant in a slightly earlier stage.

A similar discussion occurred in *State ex rel. Hardin v. Sanders*. There the Court quoted *Wenger*, 69 Dickinson L.Rev. 258, 268:

> The sole difference between viability and nonviability is merely a matter of time. . . . Moreover, the viability test is uniformly criticized by writers as being unworkable, for the time at which a previable foetus becomes viable is indefinite and therefore, incapable of precise determination. Thus, since any limitation will be arbitrary in nature, a tangible and concrete event would be the most acceptable and workable boundary. Birth, being a definite, observable and significant event, meets this requirement.

*Hardin,* 538 S.W.2d at 339. I would add that conception is definite, observable in the scientific sense, and significant. But there are other definite, discernible and significant events consistent with the common law concept of a "quick" child that might also serve as a basis for establishing the boundary.[2]

As recognized by Holmes in *Dietrich*, the common law made it a crime to take the life of an unborn "quick" child. But that was not the only protection provided preborn children at common law:

> The common-law has accorded unborn children property rights for nearly 300 years. For purposes of inheritance, such children are considered persons "in being." Courts have consistently held that the unborn are entitled to the appointment of guardians in order to protect the child's interest in the property that represents proceeds or the corpus of a trust.
>
> . . . .
>
> The unborn child has been afforded rights sufficient for legal protection in other areas of the law. A fetus has been

**2.** The common law notion of quickening is related to discernible movement. Movement may be involuntary, such as a heartbeat or reflex response to a stimulus, or the spontaneous movement of the fetus. Certainly, when involuntary, reflexive and spontaneous movement occur, the common law standard of a "quick" child has been satisfied.

held to be a person under the Civil Rights Act of 1871. Unborn children, though previable, have been found to be persons within the meaning of insurance policies.

Bopp, Jr., Bostrom, and McKinney, *The "Rights" and "Wrongs" of Wrongful Birth and Wrongful Life: A Jurisprudential Analysis of Birth Related Torts,* 27 Duq.L.Rev. 461, 481, 482 (1989). There is substantial authority in the common law to support the idea that after conception an expected child has certain protectable interests. To the extent it is not in conflict with the state constitution and other statutes, the common law is the law of Missouri. § 1.010 RSMo 1986.

The majority opinions have not analyzed the concept of viability, nor have they examined the plain language of our wrongful death statute to determine whether viability should play a role in the parents' right to recover for the negligently caused death of an expected child. Chief Justice Blackmar's opinion has simply stated four policy reasons for denying recovery. The same policy arguments for denying recovery for the death of a nonviable fetus could be made for denying recovery for a viable fetus or even a newborn infant. If a viable fetus or a newborn infant is killed because of some negligent act by a third party, it may conveniently be argued that 1) there is uncertainty that the fetus would survive birth or that a newborn infant would survive to any age at which the parents might benefit from the child, 2) the mother, if injured in the same accident, could recover her damages, 3) the father has a derivative action for the loss of the mother's consortium, and 4) fertile parents may conceive other children.

As to the first argument, all future damages are subject to some uncertainty, but that has never been a basis for denying their recovery. The arguments that the mother has her own cause of action and the father a derivative action were considered and sternly rejected in *Steggall v. Morris,* where the Court noted that a mother could not recover for the negligent prenatal injury to a child which resulted in the birth of a deformed or sickly child because any injury

to the mother is separate from the injury to a child. *Steggall,* 258 S.W.2d at 581.

The fourth argument is by far the most offensive. It assumes that children before birth, or at least before viability, are a fungible product which can be replaced like a bucket of coal or a bushel of wheat. In point of fact, the parents of an expected child have been denied the unique "services, consortium, companionship, comfort ... and support" of that particular child because of the wrongful act of a stranger. *See* § 537.090 RSMo 1986. I find the policy rationales used in Chief Justice Blackmar's opinion to be unacceptable and out of harmony with the plain language and clear intent of our wrongful death statute.

Judge Robertson's opinion does not examine the plain language of the statute. His opinion hinges on one rule of statutory construction which, as previously noted, is inapposite. Any discussion of the meaning of a statute necessarily begins with the language of the statute. Our present wrongful death statute was enacted in 1979, but the relevant language became the law of this state on December 8, 1855. In pertinent part it stated:

> Whenever the death of a person shall be caused by a wrongful act, neglect or default of another, and the act, neglect or default, is such as would (if death had not ensued) have entitled the party injured to maintain an action, and recover damages in respect thereof, then, ... the person who... would have been liable if death had not ensued, shall be liable to an action for damages....

Laws of 1855, Ch. 51, § 3. That statute is nearly identical to the language of § 537.080 RSMo 1986. Neither the original statute nor the present statute defines "person." The legislative silence means no more than that the legislature left the definition of the term up to the courts.

The current state of the law is that regardless of the stage of development at which a fetus is injured, if it survives the negligently inflicted injury, an action for damages will lie against the party causing the injury for any resulting disability or

deformity. *See* Annotation, *Prenatal Injuries–Liability*, 40 A.L.R.3d 1222, 1230, § 3[a] and cases cited therein. Under the plain language of our statute, if a fetus is killed because of a wrongful act for which damages could be recovered had death not ensued, then a wrongful death action lies against the wrongdoer. The only way to conclude that the word "person" is ambiguous is to reject clear scientific evidence and reject the overwhelming weight of the common law, not to mention overruling two well-reasoned precedents of this Court. There is no ambiguity in the statute. Thus, there is no need to resort to artificial canons of statutory construction.

If one must resort to the rules of statutory construction, the *first* rule of statutory construction is to give effect to the intent of the legislature. *State ex rel. Board of Registration for Healing Arts v. Southworth*, 704 S.W.2d 219, 224 (Mo. banc 1986). In determining that intent, the Court construes the statute in light of the purposes for which the statute was enacted and the evils it was intended to cure. *In the Interest of A.M.B.*, 738 S.W.2d 128, 130 (Mo.App.1987). Both majority opinions adopt a reading of the statute which make it economically preferable for a tort-feasor to kill the fetus rather than merely injure the fetus. That is precisely the injustice which the wrongful death statute was designed to remedy.

Rules of statutory construction should never be applied so as to defeat the purpose of the statute. The viability standard is not in the plain language of the statute; it is not consistent with the common law; it is incongruous with reason. Accordingly, I would reverse the trial court's order of dismissal.

RENDLEN, J., concurs.