466 S.E.2d 522

**Kenneth FARLEY, as Administrator of the Estate of Baby Farley, an Unborn Child, Plaintiff Below, Appellant,**

v.

**Billy R. SARTIN and Lee Sartin Trucking Company, Inc., Defendants Below, Appellees.**

No. 22797.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 1995.

Decided Dec. 13, 1995.

Donald R. Jarrell, Wayne, for Appellant.

# 672

Steven K. Nord, P. Blake Benton, Offutt, Eifert, Fisher, Duffield & Nord, Huntington, for Appellees.

Roger Forman, Forman & Crane, L.C., Charleston, Susan J. Weiler, Kathryn Kolbert, Lynn M. Paltrow, The Center for Reproductive Law & Policy, New York City, for amicus curiae West Virginia Free.

CLECKLEY, Justice:

The plaintiff below and appellant herein, Kenneth Farley, as the Administrator of the Estate of Baby Farley, his unborn child, appeals from the September 8, 1994, order of the Circuit Court of Wayne County. This order granted a motion for summary judgment by the defendants below and appellees herein, Billy R. Sartin and Lee Sartin Trucking Company, Inc., and dismissed the plaintiff's case with prejudice. The issue presented to this Court on appeal is whether the plaintiff can maintain a cause of action under West Virginia's wrongful death statute, W.Va.Code, 55–7–5 (1931),[1] for the death of Baby Farley, who was eighteen to twenty-two weeks of gestation and, at best, of questionable viability in light of the evidence presented to the circuit court. Upon review, we conclude the plaintiff may maintain his cause of action regardless of viability and, therefore, we reverse the order of the circuit court.

I.

## FACTS AND PROCEDURAL HISTORY

On November 6, 1991, the plaintiff's pregnant wife, Cynthia Farley, was killed in an automobile accident she had with the defendant, Billy R. Sartin, who was driving a tractor trailer owned by the defendant, Lee Sartin Trucking Company, Inc. The deposition of Mrs. Farley's treating obstetrician, Dr. Gary Gilbert, which was the only medical testimony in the record, adduced the following. Mrs. Farley was probably eighteen weeks and a few days pregnant when calculated from the date of the first day of her last menses, although she could have been as far along as twenty-two weeks pregnant.[2] Baby Farley was neither large enough nor developed enough to survive outside the womb.[3]

1. In relevant part, W.Va.Code, 55–7–5, states:
   "Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter."
   The person who may bring an action for wrongful death, the amount and the distribution of damages, and the statute of limitations for bringing such an action are set forth in W.Va.Code, 55–7–6 (1992).

2. Dr. Gilbert indicated that the gestational age of Baby Farley was an estimate because more accurate testing is not performed on a normal pregnant woman until her twentieth week of pregnancy and Mrs. Farley had not reached that point when calculated from her last menses.

3. At this gestational age of development, an unborn child often is referred to as a fetus. Biologically, a fetus is defined as "the unborn offspring in the post embryonic period after major structures have been outlined (in man from seven or eight weeks after fertilization until birth)."

*Black's Law Dictionary* 621 (6th ed. 1990). Between the second and eighth week of development after fertilization is referred to as the "embryo" stage. The first week after fertilization is called the "ovum" stage. *See Taber's Cyclopedic Medical Dictionary* E–19 (13th ed. 1977). Although we recognize the biological distinction among the ovum, embryo, and fetus stages, this distinction largely is irrelevant to this opinion because we are concerned with the concept of viability and the time frame from conception to viability and viability to birth.

Throughout the cases and literature reviewed and cited by this Court, the terms "fetus" and "unborn child" frequently are used interchangeably. (The common definition of "child" includes "an unborn ... person[.]" *Webster's New Collegiate Dictionary*, first definition, in part, 191 (1979)). By our use of the phrase "unborn child" in the context of this opinion, we are sensitive to those who may have philosophical, religious, or other reasons why they prefer the term "fetus" over the phrase "unborn child" or vice versa. In this respect, our reference is not designed to pass judgment upon these reasons nor do we intend to invoke an emotional response on the part of the reader. For purposes of this opinion, we frame the issue in the context of the phrase "unborn child" to encompass all stages of development after conception where the medical definition of "fetus" limits the developmental time frame.

"The earliest surviving infant that [the doctor knew] of was right at 500 grams, which would have been about 22 weeks." Dr. Gilbert concluded that if Mrs. Farley had not been killed in the accident, he had "no reason to believe that she would not have a normal pregnancy."

The plaintiff filed a wrongful death action as the Administrator of the Estate of Baby Farley. In response, the defendants filed a motion for summary judgment pursuant to Rule 56 of the West Virginia Rules of Civil Procedure on the basis that Baby Farley was not viable at the time of death; therefore, the defendants argued Baby Farley was not a "person" under the wrongful death statute, W.Va.Code, 55–7–5. After reviewing the parties' respective motions and supporting memoranda, the circuit court granted summary judgment in favor of the defendants.

The issue presented to this Court is narrow and one of first impression. Although the plaintiff first argues that this case presents a genuine issue of fact as to whether Baby Farley was a viable child at the time of the accident, we find the more critical issue is whether viability is the appropriate criterion to determine whether an unborn child is a "person" within the context of W.Va.Code, 55–7–5.[4] Our discussion and holding are limited to this issue only, and what we say in this opinion should not be considered as indicative of our views on other unrelated issues, especially those on abortion. For reasons that will follow, we find that viability is not the appropriate criterion to determine whether an unborn child is a "person" within the context of W.Va.Code, 55–7–5.

We also explicitly limit this holding to unborn children who are en ventre sa mere and decline to address the issues that may arise with advances in medical technology now enabling conception outside the womb. In addition, we decline to address the area of preconception torts that may result in the death of an unborn child.

In *Black's Law Dictionary* at 534, the phrase "en ventre sa mere" is defined as: "In its mother's womb. A term descriptive of an unborn child. For some purposes the law regards an infant *en ventre* as in being. It may take a

## II.

### STANDARD OF REVIEW

We review a circuit court's entry of summary judgment *de novo.* Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Moreover, whether viability is the appropriate criterion to determine if an unborn child is a "person" within the context of the wrongful death statute is purely a question of law, and we give questions of law *de novo* and plenary review. *See State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 776, 461 S.E.2d 516, 522 (1995) ("[a]s a result of this inquiry being strictly a matter of statutory construction, our power of interpretive scrutiny is plenary") (citation omitted); *Burnside v. Burnside,* 194 W.Va. 263, 265, 460 S.E.2d 264, 266 (1995) ("questions of law and statutory interpretations are subject to *de novo* review") (citation omitted).

As a result of this case being decided on a motion for summary judgment, we appropriately make certain factual assumptions in order to frame the legal issues. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* ––– U.S. –––, –––, 115 S.Ct. 2407, 2412, 132 L.Ed.2d 597, 609–10 (1995). "We shall assume, as summary judgment procedure requires us to assume, that the sole reason for" the death of the nonviable unborn child was the accident and that Mrs. Farley would have had a normal pregnancy absent the accident. *McKennon v. Nashville Banner Pub. Co.,* ––– U.S. –––, –––, 115 S.Ct. 879, 883, 130 L.Ed.2d 852, 860 (1995). As part of our review, we find it necessary to begin our analysis of the legal issue presented by discussing the inception and evolution of wrongful death statutes.

legacy; have a guardian; an estate may be limited to its use, etc." (Citations omitted).

4. We do not mean to suggest that the plaintiff's contention regarding the existence of a genuine issue of material fact is frivolous. Rather, we choose to take the more definitive route and decide the conclusive and dispositive legal question. We express no opinion whether the record could support a remand to the circuit court on this issue alone.

## III.

## THE HISTORY OF WRONGFUL DEATH ACTIONS

### A.

#### Generally

■ At common law, there was no cause of action for the wrongful death of a person. *Voelker v. Frederick Business Props. Co.*, 195 W.Va. 246, 250, 465 S.E.2d 246, 250 (1995); *Swope v. Keystone Coal and Coke Co.*, 78 W.Va. 517, 522, 89 S.E. 284, 286 (1916).[5] In *Baker v. Bolton*, 1 Camp. 493, 170 Eng.Rep. 1033 (1808), Lord Ellenborough wrote that "[i]n a civil Court, the death of a human being could not be complained of as an injury[.]" In essence, the cause of action died with the victim, and there was no compensation for the victim's dependents or heirs. W. Page Keeton, Dan B. Dobbs, Robert E. Keeton, David G. Owen, *Prosser and Keeton on Torts* § 127 at 945 (5th ed. 1984).[6] Under this harsh rule, tortfeasors, who otherwise would have been liable for their victims' injuries, escaped all liability when the injuries were severe enough to kill the victims. Consequently, bereaved families of deceased victims often were left destitute. Keeton, *et al., supra* § 127 at 945.[7]

Recognizing the problem with this result, the English Parliament passed the Fatal Accidents Act of 1846, commonly referred to as Lord Campbell's Act. 9 & 10 Vict. c. 93 (1846). This Act permitted recovery of damages by the close relatives of a victim who was tortiously killed. In his article *Wrongful Death and the Lost Society of the Unborn*, 13 J.Legal Med. 99, 100 n. 9 (1992), Gary A. Meadows wrote the Act, in essence, provided:

"[W]henever the death of a person is caused by the wrongful act, neglect, or default of another, in such a manner as would have entitled the party injured to have sued had death not ensued, an action may be maintained if brought within twelve months after [the] death in the name of [the] executor or administrator for the benefit of the wife, husband, parent, and child of the person whose death shall have been so caused."

Thus, by creating a cause of action for wrongful death, the English Parliament rectified the disparity between a tortfeasor's liability for injuries and for the more egregious harm, death.

Despite the passage of Lord Campbell's Act, courts in the United States subsequently advanced various rationalizations in support of denying a cause of action for wrongful death. 1 Stuart M. Speiser, Charles F. Krause, Juanita M. Madole, *Recovery for Wrongful Death and Injury* § 1:4 at 13 (3rd ed. 1992). T.A. Smedley stated that American judges formulated the rationalizations because they were "[u]nwilling to repudiate an established rule of law" and were "unsatisfied with the historical bases for the rule[.]" *Wrongful Death—Bases of the Common Law*

---

**5.** *Cf. Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 381–86, 90 S.Ct. 1772, 1777–80, 26 L.Ed.2d 339, 346–49 (1970). In *Justus v. Atchison*, 19 Cal.3d 564, 573, 139 Cal.Rptr. 97, 103, 565 P.2d 122, 128 (1977), *overruled on other grounds Ochoa v. Superior Court*, 39 Cal.3d 159, 216 Cal.Rptr. 661, 703 P.2d 1 (1985), the Supreme Court of California stated that *Moragne* "cast doubt on the historical basis of the first of these beliefs, i.e., that no cause of action for wrongful death existed at common law" when the Supreme Court "recognized a cause of action for wrongful death under general maritime law."

**6.** The English common law had the following three restrictive rules with regard to the death of an individual in a personal injury case:

"1. If the tortfeasor died before the victim recovered for the tort, the victim's right of action died with him.

"2. If the victim of a tort himself died (from whatever cause) before he recovered in tort, the victim's right of action also died.

"3. If the tortfeasor caused a victim's death, relatives and dependents of the victim who were deprived of financial support or who suffered emotional loss, had no cause of action of their own."

Keeton, *et al., supra* § 125A at 940. (Footnotes omitted). The first two rules have been replaced by " 'survival statutes,' which permit the cause of action the victim himself owned at the time of tort to survive so that it may be carried on if either the plaintiff or defendant dies. The third rule has been changed by acts generally known as 'wrongful death' statutes." Keeton, *et al., supra* § 125A at 942.

**7.** This rule was subject to sharp criticism. William L. Prosser stated Lord Ellenborough's "forte was never common sense[.]" *Torts* § 127 at 901 (4th ed. 1971).

*Rules*, 13 Vand.L.Rev. 605, 617 (1960). The rationalizations announced by the various courts included the idea that it was inconsistent with legal policy to judicially calculate the value of human life; that permitting wrongful death actions would lead to endless cases with large verdicts; that, in accord with Christianity, human life is sacred and it would be revolting to compensate its loss with money; and that it is impossible to calculate the pecuniary value of human life. 1 Speiser, *et al., supra* § 1:4 at 13 (citations omitted); Smedley, *supra* at 617–19.

It did not take long, however, until state legislatures began passing laws similar to Lord Campbell's Act. The first wrongful death statute was passed by New York in 1847.[8] 22A Am.Jur.2d *Death* § 7 (1988). Currently, every state has created a cause of action for wrongful death. 1 Speiser, *et al., supra* § 1:9 at 32–33. (Citation omitted). A majority of these statutes are patterned after Lord Campbell's Act by establishing "a right of action for losses suffered by statutorily designated beneficiaries by reason of the death. Others, of somewhat varying types and specific provisions, may be broadly classified as statutes under which death damages are measured by the loss occasioned to decedent's estate by the death." 1 Speiser, *et al., supra* § 1:9 at 33. The first statute in West Virginia was passed in 1863, and "was the same in general purpose and effect as [Lord Campbell's Act]." *Swope*, 78 W.Va. at 522, 89 S.E. at 286. *See also Voelker*, 195 W.Va. at 250, 465 S.E.2d at 250.

### B.

### *Prenatal Torts and Wrongful Death*

■ With the enactment of wrongful death statutes, recovery became a matter of statutory right. Sheryl A. Symonds, *Wrongful Death of the Fetus: Viability is Not a Viable Distinction*, 8 U.Puget Sound L.Rev. 103, 104 (1984). The common law did not permit recovery for prenatal torts in general, *e.g., Dietrich v. Inhabitants of Northampton*, 138 Mass. 14, 52 Am.Rep. 242 (1884), *overruled, Torigian v. Watertown News Co.*, 352 Mass.

446, 225 N.E.2d 926 (1967); 1 Speiser, *supra* § 4:33 at 180; Symonds, *supra* at 106, and courts remained hesitant to allow wrongful death actions for unborn children. Barbara E. Lingle, Comment, *Allowing Fetal Wrongful Death Actions in Arkansas: A Death Whose Time Has Come?*, 44 Ark.L.Rev. 465, 468 (1991).

In *Dietrich*, a woman who was in her fourth or fifth month of pregnancy slipped and fell as a result of a defective highway. The woman miscarried the infant which was said to have lived for a few minutes. Justice Oliver Wendell Holmes, Jr., writing for the Supreme Judicial Court of Massachusetts, stated he was unaware of any case "that, if the infant survived, it could maintain an action for injuries received by it while in its mother's womb." 138 Mass. at 15, 52 Am. Rep. at 243. Justice Holmes expressed the opinion that the unborn infant was "a part of the mother at the time of the injury" and any damage to the infant "which was not too remote" to deny recovery altogether was recoverable by the mother. 138 Mass. at 17, 52 Am.Rep. at 245. This approach, that an unborn infant was not "an independent biological entity" from its mother, is referred to as the " 'single entity' view[.]" Lingle, *supra* at 468–69.

The lack of remedy for a tortiously injured unborn child neither went unnoticed nor avoided criticism. Justice Boggs' dissent in *Allaire v. St. Luke's Hospital*, 184 Ill. 359, 56 N.E. 638 (1900),[9] is credited with starting the movement to abolish the theory that a tortfeasor owes no duty to an unborn child because the child "was not in existence at the time of [the] action[.]" Keeton, *et al., supra* § 55 at 367, 368 n. 13. Justice Boggs stated that he knew of no cases at common law where a plaintiff was able to recover damages for injuries the plaintiff suffered while in the womb. However, he quoted Lord Mansfield as stating: " 'The law of England would be an absurd science were it founded upon precedents only. Precedents,' he observed, 'were to illustrate principles, and to give them a fixed certainty.' 1 Kent, Comm.

---

8. Laws of 1847, Ch. 450.

9. *Allaire* was overruled in *Amann v. Faidy*, 415 Ill. 422, 114 N.E.2d 412 (1953).

477." 184 Ill. at 368, 56 N.E. at 640. Justice Boggs continued by explaining that " 'a principle newly applied is not supposed to be a new principle. On the contrary, it is assumed that from time immemorial it has constituted a part of the common law of the land, and that it has only not been applied before because no occasion has arisen for its application.' " 184 Ill. at 369, 56 N.E. at 641. (Citation omitted).

The argument at common law was that "an unborn child was but a part of the mother, and had no existence or being which could be the subject-matter of injury distinct from the mother, and that an injury to it was but an injury to the mother[.]" 184 Ill. at 370, 56 N.E. at 641. Nevertheless, Justice Boggs recognized the fact that "[m]edical science and skill and experience" known at that time dictated a different result. In this respect, Justice Boggs related:

> "A foetus in the womb of the mother may well be regarded as but a part of the bowels of the mother during a portion of the period of gestation; but if, while in the womb, it reaches that pre-natal age of viability when the destruction of the life of the mother does not necessarily end its existence also, and when, if separated prematurely and by artificial means from the mother, it would be so far a matured human being as that it would live and grow, mentally and physically, as other children generally, it is but to deny a palpable fact to argue there is but one life, and that the life of the mother. Medical science and skill and experience have demonstrated that at a period of gestation in advance of the period of parturition the foetus is capable of independent and separate life, and that, though within the body of the mother, it is not merely a part of her body, for her body may die in all of its parts and the child remain alive, and capable of maintaining life when separated from the dead body of the mother." 184 Ill. at 370, 56 N.E. at 641.

See also Meadows, supra at 106–07. Justice Boggs concluded this passage by asking the question: "If at that period a child so advanced is injured in its limbs or members and is born into the living world suffering from the effects of the injury, is it not sacrificing truth to a mere theoretical abstraction to say the injury was not to the child but wholly to the mother?" 184 Ill. at 370, 56 N.E. at 641.

It was not until 1946 that an American court departed from the Dietrich approach. In Bonbrest v. Kotz, 65 F.Supp. 138 (D.D.C. 1946), the United States District Court for the District of Columbia addressed the question of whether a child could maintain a right of action upon the allegation that she was injured because of professional malpractice when she was taken from her mother's womb. 65 F.Supp. at 139. Although the district court distinguished its case from Dietrich on the basis that the child in Bonbrest suffered "a direct injury" by the tortfeasor, the district court went on to state:

> "As to a viable child being 'part' of its mother—this argument seems to me to be a contradiction in terms. True, it is in the womb, but it is capable now of extrauterine life—and while dependent for its continued development on sustenance derived from its peculiar relationship to its mother, it is not a 'part' of the mother in the sense of a constituent element—as that term is generally understood. Modern medicine is replete with cases of living children being taken from dead mothers. Indeed, apart from viability, a non-viable foetus is not a part of its mother." 65 F.Supp. at 140. (Footnote omitted).[10]

The district court determined that logic and justice require " 'that a child, if born alive and viable[,] . . . should be allowed to maintain an action in the courts for injuries wrongfully committed upon its person while in the womb of its mother.' " 65 F.Supp. at 142, quoting Montreal Tramways v. Leveille, 4 Dom.L.R. 337 (1933). (Emphasis added in Bonbrest ). To permit otherwise would allow a wrong to be inflicted for which no remedy

---

**10.** The district court also said that "[f]rom the viewpoint of the civil law and the law of property, a child en ventre sa mere is not only regarded as a human being, but as such from the moment of conception—which it is in fact." 65 F.Supp. at 140. (Footnote omitted). For the definition of "en ventre sa mere," see note 3, supra.

exists. 65 F.Supp. at 141. In making this holding, the district court rejected arguments that permitting a cause of action would result in other cases being filed in bad faith and may result in "insuperable difficulties of proof." 65 F.Supp. at 142–43. It is clear from the language and analysis that both the "single entity view" and the no-duty rule were disavowed in *Bonbrest.*

■ Following *Bonbrest,* "a rapid series of cases, many of them expressly overruling prior holdings, brought about a rather spectacular reversal of the no-duty rule." Keeton, *et al., supra* § 55 at 368. (Footnotes omitted). Indeed, today, every jurisdiction permits recovery for prenatal injuries if a child is born alive.[11] *Restatement (Second) of Torts* § 869 App., note, subsection 1 at 79 (1982); Keeton, *et al., supra* § 55 at 368. In addition, it generally does not matter whether the injury occurred prior to or after the point of viability. *Restatement (Second) of Torts* § 869 and cmt. subsection 1(d) at 276–77 (1977); 62A Am.Jur.2d *Prenatal Injuries: Wrongful Life, Birth, or Conception* § 18 (1990).

Courts have offered various rationales for refusing to require proof that the unborn child was viable at the time of injury. Some have relied on "the fact that an unborn child is biologically separate from its mother from the time of conception." 62A Am.Jur.2d, *supra* § 19 at 413. This approach, referred to as the "biological theory," presumes that an unborn child is not a "legal person" until birth, but it imposes "conditional liability" for

an injury "which becomes unconditional or complete upon the birth of the injured separate entity as a legal person." 62A Am.Jur.2d, *supra* § 19 at 413. If an unborn child dies prior to birth, no liability attaches because no damage was inflicted on a "legal person." 62A Am.Jur.2d, *supra* § 19 at 413, *citing Puhl v. Milwaukee Auto. Ins. Co.,* 8 Wis.2d 343, 99 N.W.2d 163 (1959), *overruled on other grounds In Re Estate of Stromsted,* 99 Wis.2d 136, 299 N.W.2d 226 (1980).

Other courts confronted with an injury suffered by an unborn child who subsequently is born alive refuse to hinge liability on fetal viability because they have concluded that an injury sustained "prior to viability is no less meritorious than a claim for one sustained afterward." 62A Am.Jur.2d, *supra* § 19 at 413, *citing Sylvia v. Gobeille,* 101 R.I. 76, 220 A.2d 222 (1966). The child suffers the same harm regardless of when the injury occurred and, therefore, should be able to obtain the same relief. 62A Am.Jur.2d, *supra* § 19 at 413, *citing Smith v. Brennan,* 31 N.J. 353, 157 A.2d 497 (1960).

Despite the fact that recovery generally is allowed for prenatal injuries for a child "born alive," courts disagree upon whether they will permit recovery for injuries causing the death of a child en ventre sa mere. Although some jurisdictions do not permit a wrongful death action to be maintained for the death of an unborn child,[12] the majority of jurisdictions now do permit a wrongful death action if the unborn child had reached the point of viability.[13] *See Restatement (Second) of*

11. *See, e.g., Wolfe v. Isbell,* 291 Ala. 327, 280 So.2d 758 (1973); *Sinkler v. Kneale,* 401 Pa. 267, 164 A.2d 93 (1960); *Damasiewicz v. Gorsuch,* 197 Md. 417, 79 A.2d 550 (1951).

12. *See Chatelain v. Kelley,* 322 Ark. 517, 910 S.W.2d 215 (1995); *Justus v. Atchison,* 19 Cal.3d 564, 565 P.2d 122, 139 Cal.Rptr. 97 (1977); *Hernandez v. Garwood,* 390 So.2d 357 (Fla.1980); *Smith v. Columbus Com. Hosp. Inc.,* 222 Neb. 776, 387 N.W.2d 490 (1986); *Egbert v. Wenzl,* 199 Neb. 573, 260 N.W.2d 480 (1977); *Giardina v. Bennett,* 111 N.J. 412, 545 A.2d 139 (1988); *Endresz v. Friedberg,* 24 N.Y.2d 478, 301 N.Y.S.2d 65, 248 N.E.2d 901 (1969); *Blackman v. Langford,* 795 S.W.2d 742 (Tex.1990); *Lawrence v. Craven Tire Co.,* 210 Va. 138, 169 S.E.2d 440 (1969).

13. *See Espadero v. Feld,* 649 F.Supp. 1480 (D.Colo.1986); *Simmons v. Howard Univ.,* 323

F.Supp. 529 (D.D.C.1971); *Wade v. U.S.,* 745 F.Supp. 1573 (D.Hawai'i 1990); *Eich v. Town of Gulf Shores,* 293 Ala. 95, 300 So.2d 354 (1974); *Summerfield v. Superior Court,* 144 Ariz. 467, 698 P.2d 712 (1985); *Hatala v. Markiewicz,* 26 Conn. Sup. 358, 224 A.2d 406 (Super.Ct.1966); *Worgan v. Greggo & Ferrara, Inc.,* 50 Del. 258, 128 A.2d 557 (Super.Ct.1956); *Volk v. Baldazo,* 103 Idaho 570, 651 P.2d 11 (1982); *Seef v. Sutkus,* 145 Ill.2d 336, 164 Ill.Dec. 594, 583 N.E.2d 510 (1991); *Britt v. Sears,* 150 Ind.App. 487, 277 N.E.2d 20 (1971); *Hale v. Manion,* 189 Kan. 143, 368 P.2d 1 (1962); *Rice v. Rizk,* 453 S.W.2d 732 (Ky.Ct.App.1970); *Danos v. St. Pierre,* 402 So.2d 633, 637 (La.1981) (rehearing opinion); *State, Use of Odham v. Sherman,* 234 Md. 179, 198 A.2d 71 (1964); *Mone v. Greyhound Lines, Inc.,* 368 Mass. 354, 331 N.E.2d 916 (1975); *O'Neill v.*

*Torts* § 369 App., *supra* subsection 2 at 80–81; Symonds, *supra* at 108; 1 Speiser, *supra* § 4:35 at 187.[14]

## C.

### General Reasons Cited for Denying Recovery for the Tortious Death of a Viable Unborn Child

Jurisdictions that originally denied a wrongful death action for a child en ventre sa mere did so for a number of reasons that now are rejected by the majority of courts. One reason for not permitting a cause of action was the lack of precedent. *See White v. Yup*, 85 Nev. 527, 536, 458 P.2d 617, 623 (1969); *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis.2d 14, 21, 148 N.W.2d 107, 111 (1967). There now, however, is plenty of precedent; the clear weight of authority currently allows a cause of action for the tortious death of a viable child en ventre sa mere. *See* note 13, *supra*. Obviously, courts heeded the teachings of Lord Mansfield and Justice Boggs that *stare decisis* does not

require static doctrines but instead permits law to evolve and to adjust to changing conditions and notions of justice as well as to varied sets of facts. *Allaire, supra.*

A second popular reason given to deny recovery is the "single entity" theory as expressed in *Dietrich, supra.* However, through medical science and technology, we know that this reason lacks support, and it too has been rejected by the majority of jurisdictions. *See, e.g., White*, 85 Nev. at 536–37, 458 P.2d at 623; *Kwaterski*, 34 Wis.2d at 21, 148 N.W.2d at 111; *see also* 62A Am.Jur.2d, *supra* § 19 at 413.

A third reason articulated for denying recovery for the wrongful death of a child en ventre sa mere is that it would lead to fraudulent claims and difficulties in proof of causation and damages. However, courts generally have concluded that such risks do not justify a bar to legitimate claims. In *Danos v. St. Pierre*, 402 So.2d 633, 638 (La.1981) (on rehearing), the Supreme Court of Louisiana explained: "The denial of valid claims in

---

*Morse*, 385 Mich. 130, 188 N.W.2d 785 (1971); *Verkennes v. Corniea*, 229 Minn. 365, 38 N.W.2d 838 (1949), *limited on other grounds State v. Soto*, 378 N.W.2d 625 (Minn.1985); *Terrell v. Rankin*, 511 So.2d 126 (Miss.1987); *Rainey v. Horn*, 221 Miss. 269, 72 So.2d 434 (1954); *Connor v. Monkem Co., Inc.*, 898 S.W.2d 89 (Mo.1995) (En Banc) (permits wrongful death action for unborn child even prior to viability); *Strzelczyk v. Jett*, 264 Mont. 153, 870 P.2d 730 (1994); *White v. Yup*, 85 Nev. 527, 458 P.2d 617 (1969); *Wallace v. Wallace*, 120 N.H. 675, 421 A.2d 134 (1980); *Poliquin v. MacDonald*, 101 N.H. 104, 135 A.2d 249 (1957); *Salazar v. St. Vincent Hosp.*, 95 N.M. 150, 619 P.2d 826 (Ct.App.), *writ quashed* 94 N.M. 806, 617 P.2d 1321 (1980); *DiDonato v. Wortman*, 320 N.C. 423, 358 S.E.2d 489 (1987); *Hopkins v. McBane*, 359 N.W.2d 862 (N.D.1984); *Werling v. Sandy*, 17 Ohio St.3d 45, 476 N.E.2d 1053 (1985); *Evans v. Olson*, 550 P.2d 924 (Okla. 1976); *Libbee v. Permanente Clinic*, 268 Or. 258, 518 P.2d 636 (1974); *Coveleski v. Bubnis*, 535 Pa. 166, 634 A.2d 608 (1993); *Amadio v. Levin*, 509 Pa. 199, 501 A.2d 1085 (1985); *Fowler v. Woodward*, 244 S.C. 608, 138 S.E.2d 42 (1964); *Farley v. Mount Marty Hosp. Assoc., Inc.*, 387 N.W.2d 42 (S.D.1986); *Vaillancourt v. Medical Ctr. Hosp. of Vermont, Inc.*, 139 Vt. 138, 425 A.2d 92 (1980); *Cavazos v. Franklin*, 73 Wash.App. 116, 867 P.2d 674 (1994); *Moen v. Hanson*, 85 Wash.2d 597, 537 P.2d 266 (1975); *Baldwin v. Butcher*, 155 W.Va. 431, 184 S.E.2d 428 (1971); *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis.2d 14, 148 N.W.2d 107 (1967).

Georgia permits recovery if an unborn child is "quick" in the womb. *Shirley v. Bacon*, 154 Ga.App. 203, 267 S.E.2d 809 (1980); *Porter v. Lassiter*, 91 Ga.App. 712, 715, 87 S.E.2d 100, 102 (1955) ("quick" means "capable of moving in its mother's womb").

**14.** It was only three years after the landmark decision of *Bonbrest* that the Supreme Court of Minnesota was faced with the wrongful death issue. In another landmark decision, *Verkennes v. Corniea*, the court determined that a cause of action does arise for the death of an unborn child as the result of another's wrongful act or omission. 229 Minn. at 370, 38 N.W.2d at 841. The court stated in Syllabus Point 2:

"Under wrongful-death statute, personal representative of unborn child alleged to be viable and capable of separate and independent existence, whose death is alleged to have been caused by the wrongful acts or omissions of the physician in charge of the mother and of the hospital in which she was confined, may maintain an action therefor on behalf of the next of kin of such deceased child."

The court further stated that "[i]t seems too plain for argument that where independent existence is possible and life is destroyed through a wrongful act a cause of action arises under the [wrongful death] statutes[.]" 229 Minn. at 370–71, 38 N.W.2d at 841. In *Verkennes*, both the mother and the child died during childbirth, and the viability of the unborn child was not questioned. 229 Minn. at 366, 371, 38 N.W.2d at 839, 841.

order to discourage fraudulent ones and to avoid difficult problems in determining causation and fixing damages not only is totally illogical, but also disregards the very essence of the judicial process." *See also Espadero v. Feld*, 649 F.Supp. 1480, 1485 (D.Colo.1986); *Hatala v. Markiewicz*, 26 Conn.Sup. 358, 360–61, 224 A.2d 406, 408 (1966); *Mone v. Greyhound Lines, Inc.*, 368 Mass. 354, 360, 331 N.E.2d 916, 919 (1975).[15]

A fourth reason traditionally given for denying recovery for the wrongful death of a child en ventre sa mere is based upon the argument that the Legislature should determine this issue and the courts should not expand the scope of liability beyond what was contemplated when the wrongful death statute was enacted. In response, courts have concluded that it is incumbent upon them to give meaning to the term "person" as used in wrongful death statutes and, in the absence of specific legislative language, that responsibility requires courts to supplement the law (i.e., fill in the statutory interstices) regardless of what conclusion is reached. In *Summerfield v. Superior Court*, 144 Ariz. 467, 475, 698 P.2d 712, 720 (1985), the Supreme Court of Arizona stated it is unlikely that its legislature ever referred to the "fetus/person issue" when it promulgated the first wrongful death statute in 1887. Therefore, the Arizona court concluded:

> "The solution to this problem cannot be found in a methodology which requires us to assume or divine a legislative intent on an issue which most probably was never considered. Rather, the solution must be found in a study of the statute, the best method to further the general goal of the legislature in adopting such a statute, and common law principles governing its application." 144 Ariz. at 475, 698 P.2d at 720.

*See also Espadero*, 649 F.Supp. at 1483; *Britt v. Sears*, 150 Ind.App. 487, 494–95, 277 N.E.2d 20, 24–25 (1971); *Danos*, 402 So.2d at 638; *DiDonato v. Wortman*, 320 N.C. 423, 434, 358 S.E.2d 489, 495 (1987); 84 A.L.R.3d 411, 418 (1978) ("it appears reasonable to assume that when the wrongful death stat-

utes have been enacted, legislators have generally given no thought to whether deaths of unborn children were intended to be included or excluded, and it is thus inappropriate to regard the issue as simply one of legislative intent").

### D.

*General Reasons Cited for Permitting a Cause of Action for the Tortious Death of a Viable Unborn Child*

Upon the belief that it was necessary to look beyond the often nonexistent legislative intent, courts have focused much of their attention on the language of the wrongful death statutes, the goals and purposes behind their enactments, and other protections afforded unborn children at common law and by statute. A wrongful death statute, such as W.Va.Code, 55–7–5, *see* note 1, *supra*, imposes three prerequisites for recovery. First, there must be a death of a "person." Second, the death must "be caused by [the] wrongful act, neglect, or default" of another. W.Va.Code, 55–7–5, in part. Third, the deceased "person" must have been entitled to a cause of action for damages if death had not occurred. In the context of an unborn child, the general question to be asked is whether the unborn child would be able to maintain a cause of action if the unborn child had lived. *See DiDonato*, 320 N.C. at 426, 358 S.E.2d at 491 ("[i]n plain English, an action for wrongful death exists if the decedent could have maintained an action for negligence or some other misconduct if he had survived"). *See also Summerfield*, 144 Ariz. at 475, 698 P.2d at 720; *Werling v. Sandy*, 17 Ohio St.3d 45, 47, 476 N.E.2d 1053, 1054 (1985).

As previously stated, every jurisdiction now permits a cause of action for prenatal injuries to a viable unborn child who is born alive. Keeton, *et al.*, *supra* § 55 at 368. Thus, many courts have determined that if a viable unborn child can maintain a cause of action for injuries sustained if born alive, it only is logical that the phrase "person" within the context of a wrongful death statute should include a viable unborn child who

---

**15.** Similarly, the view that to allow recovery for a child en ventre sa mere would promote double recoveries is insufficient to deny recovery. *See*

*Mone*, 368 Mass. at 359, 331 N.E.2d at 919; *Kwaterski*, 34 Wis.2d at 21, 148 N.W.2d at 111.

680

would have been born alive but for the tortious injury inflicted causing death prior to birth. *See Summerfield,* 144 Ariz. at 475, 698 P.2d at 720; *O'Grady v. Brown,* 654 S.W.2d 904, 910 (Mo.1983); *DiDonato,* 320 N.C. at 427, 358 S.E.2d at 491; *Werling,* 17 Ohio St.3d at 48, 476 N.E.2d at 1055; *Evans v. Olson,* 550 P.2d 924, 928 (Okla.1976).

In addition, wrongful death statutes were enacted to preserve and protect human life by deterring tortious conduct and to provide damages when such conduct results in death. *Espadero,* 649 F.Supp. at 1483; *Volk v. Baldazo,* 103 Idaho 570, 574, 651 P.2d 11, 15 (1982). The disparity that results from not permitting a wrongful death action for the death of a viable unborn child while allowing a recovery for injuries if the unborn child is born alive creates the same injustice as existed prior to the enactment of wrongful death statutes. In essence, with no wrongful death cause of action for a viable unborn child, a tortfeasor is given immunity from liability for a greater harm. *Wade v. U.S.,* 745 F.Supp. 1573, 1579 (D.Hawai'i 1990); *Mone,* 368 Mass. at 361, 331 N.E.2d at 920.

Some courts also have recognized that their legislatures have taken measures to protect the interests of unborn children in other areas of the law. *See, e.g., Volk,* 103 Idaho at 573, 651 P.2d at 14 ("[p]osthumous children are treated as if living at the death of their parent for the purpose of inheriting future interests.... A guardian ad litem may be appointed for unborn persons." (Citations omitted)); *Britt,* 150 Ind.App. at 496, 277 N.E.2d at 26 ("with respect to health regulations concerning deaths a stillbirth is treated exactly the same as any death of any human being"); *Werling,* 17 Ohio St.3d at 47, 476 N.E.2d at 1054 ("[t]he rights of an unborn child are no strangers to our law.... The intestate rights of a posthumous child are recognized"). *Compare* W.Va.Code, 42–1–8 (1923) ("[p]osthumous children to take"); W.Va.Code, 41–4–1 (1972) ("[w]here no child living when will made"); W.Va.Code, 16–5–20 (1969) ("[f]etal death registration"). Extending that recognition to inclusion of the unborn as "persons" in wrongful death statutes is consistent with these legislative determinations.

E.

*Recognition of a Cause of Action for the Tortious Death of A Viable Unborn Child in West Virginia*

In West Virginia, we recognized the right of the survivors of a viable unborn child to recover for wrongful death in *Baldwin v. Butcher,* 155 W.Va. 431, 184 S.E.2d 428 (1971). In the Syllabus of *Baldwin,* we stated:

"Under the provisions of Sections 5 and 6, Article 7, Chapter 55, Code, 1931, as amended, the wrongful death statute of this State, an action may be maintained by the personal representative of a viable unborn child for the wrongful death of such child caused by injuries sustained by it while in the womb of its mother resulting from the negligence of the defendant and, upon sufficient proof, such damages as may be recoverable under the statute may be awarded in such action."

In making this determination, we relied, in part, upon our prior decisions that firmly established that W.Va.Code, 55–7–5, is a remedial statute and should be liberally construed. *City of Wheeling ex rel. Carter v. American Cas. Co.,* 131 W.Va. 584, 590, 48 S.E.2d 404, 408 (1948) (" '[t]he statute, being remedial, should be liberally construed' "); *Wilder v. Charleston Transit Co.,* 120 W.Va. 319, 322, 197 S.E. 814, 816 (1938) (" '[t]he policy of the statute is remedial and not punitive' "). *Baldwin,* 155 W.Va. at 437, 184 S.E.2d at 431. In addition, we cited *Steggall v. Morris,* 363 Mo. 1224, 258 S.W.2d 577 (1953), for the proposition "that a remedial statute should not be strictly construed even though it changes a common-law rule." 155 W.Va. at 437, 184 S.E.2d at 431. We further quoted *State, Use of Odham v. Sherman,* 234 Md. 179, 184, 198 A.2d 71, 73 (1964), in which the Maryland court stated with regard to its wrongful death statute: " 'What is true of Lord Campbell's Act is also true of the statute allowing the child's cause of action to survive and be litigated by an administrator. Both statutes are remedial and designed to close a gap in the preexisting law.' " 155 W.Va. at 437, 184 S.E.2d at 431.

We next turned to the language of our wrongful death statute and framed the issue in terms of "whether a viable unborn child whose death is caused by the negligence of a defendant is a person within the meaning of the statute." 155 W.Va. at 437–38, 184 S.E.2d at 432. After reviewing cases from a number of jurisdictions on both sides of the controversy,[16] we found no merit to the general arguments denying recovery, that is, that (1) there was a lack of precedent, (2) an unborn viable child had no jurisdictional existence apart from the mother, (3) it would lead to fraud and difficulties in proof, and (4) it is in derogation of legislative intent and should be left to the legislature to decide. 155 W.Va. at 442–43, 184 S.E.2d at 434.

On the other hand, we agreed with the arguments that permit a cause of action. For instance, we explained that "there should be no difference in liability when the death occurs just before or just after the child is born." 155 W.Va. at 443, 184 S.E.2d at 435. To illustrate this point, we used an example of twins and stated: "The injustice and the patently illogical result of permitting an action for wrongful death in favor of the twin who is born alive but dies within a few hours and denying such action in behalf of the stillborn twin are self-evident and require no supporting argument." 155 W.Va. at 443–44, 184 S.E.2d at 435. Moreover, we found that it would be absurd to impose liability for injury to an unborn child while creating immunity for a tortfeasor who committed a greater harm, i.e., destroying a viable unborn child. 155 W.Va. at 444, 184 S.E.2d at 435. Without a cause of action for the wrongful death of a viable unborn child, a wrong could be inflicted for which no remedy would lie, a

circumstance that "is contrary to the traditional policy of the common law." 155 W.Va. at 444, 184 S.E.2d at 435.[17] Finally, we observed that the law confers significance on the unborn's existence in other contexts: "An unborn child possesses certain rights at common law," including having a legacy, guardian, and estate. 155 W.Va. at 446, 184 S.E.2d at 435, *citing Blackstone's Commentaries,* Book 1, at 129–30 (1860).

## IV.

## A CAUSE OF ACTION FOR THE TORTIOUS DEATH OF A NONVIABLE UNBORN CHILD

■ First, we agree with those jurisdictions that hold a tortious injury suffered by a nonviable child en ventre sa mere who subsequently is born alive is compensable and no less meritorious than an injury inflicted upon a viable child who subsequently is born alive.[18] To declare otherwise not only would lead to unjust and inequitable results but also would be contrary to the underlying philosophies of our tort law. In this respect, viability at the time of the injury is "a mere theoretical abstraction"[19] if a child born alive suffers from a pre-viability tort as opposed to a post-viability tort.

■ Turning to a cause of action for wrongful death, we confront the issue of whether "viability" is the proper line upon which we should permit a cause of action. With the exception of Georgia, which allows recovery after an unborn child is quick in the womb,[20] and Missouri, which found legislative direction to hold a nonviable child is a "person" under its wrongful death statute,[21] we

---

**16.** One case cited in *Baldwin* was *Panagopoulous v. Martin,* 295 F.Supp. 220 (S.D.W.Va.1969). Although not binding upon this Court, the federal district court determined that a viable unborn child is a "person" in the context of W.Va.Code, 55-7-5.

**17.** In this respect, in *Baldwin* we found: "It is well established that the mother can not recover damages for the loss of her stillborn child and unless an action in behalf of the child can be maintained no recovery can be had for a tort which is separate and independent of that which caused the injuries of the mother for which she can recover." 155 W.Va. at 444, 184 S.E.2d at 435.

**18.** *See Smith v. Brennan,* 31 N.J. 353, 157 A.2d 497 (1960); *Sylvia v. Gobeille,* 101 R.I. 76, 220 A.2d 222 (1966); *Restatement (Second) Torts, supra* § 869 and comt. (d) at 276–77; 62A Am. Jur.2d, *supra* §§ 18 and 19 at 412–13.

**19.** *Allaire,* 184 Ill. at 370, 56 N.E. at 641. (Boggs, J., dissenting).

**20.** *See* note 13, *supra.*

**21.** *See Connor, supra.*

are not aware of any other cases that permit recovery for injury prior to viability unless there is a live birth.[22] As previously stated, however, a lack of precedent—standing alone—is an insufficient reason to deny a cause of action.[23] Rather, we must examine the reasons for the dearth of precedent and determine whether those reasons give due cause for refusing to extend the law. After reviewing a number of nonviable unborn child decisions in jurisdictions that permit a cause of action for a viable unborn child, we can find no legitimate or persuasive reason to infuse the distinction into West Virginia's statute.[24] We do not believe that proper application of *stare decisis* prevents us from rejecting an unjustified and unpersuasive majority position. Nor does abandoning the majority position in any way cause harm to any West Virginia interest. "Primary behavior is not affected: no rule of conduct is retroactively changed[.]" *Allied–Bruce Terminix Cos., Inc. v. Dobson*, — U.S. —, —, 115 S.Ct. 834, 845, 130 L.Ed.2d 753, 771 (1995). (Scalia, J., dissenting). The law merely is made applicable and beneficial to a broader class of litigants.

In jurisdictions where the viability standard is controlling, the tortfeasor remains unaccountable for the full extent of the injuries inflicted by his or her wrongful conduct. In our judgment, justice is denied when a tortfeasor is permitted to walk away with impunity because of the happenstance that the unborn child had not yet reached viability at the time of death. The societal and parental loss is egregious regardless of the state of fetal development. Our concern reflects the fundamental value determination of our society that life—old, young, and prospective—should not be wrongfully taken away. In the absence of legislative direction, the overriding importance of the interest that we have identified merits judicial recognition and protection by imposing the most liberal means of recovery that our law permits.

As explained by Justice Maddox in his dissent in *Gentry v. Gilmore*, 613 So.2d 1241, 1246 (Ala.1993), in construing Alabama's wrongful death statute, the phrase "minor child" should be interpreted to include a nonviable unborn child. To give it such a construction, Justice Maddox said, would

"(1) promote the purpose of the wrongful death statute, which is to prevent the wrongful termination of life, even potential life; (2) facilitate the legislature's intent to protect nonviable fetal life, as expressed in other statutes concerning abortion and fetal deaths; and (3) be logically consistent with prior decisions of this Court that have, in my opinion, rejected what I believe are artificial distinctions based on viability and live birth as conditions for recovery." 613 So.2d at 1245.

In addition, Justice Maddox stated that "in distinguishing between viability and nonviability of the fetus as a condition for the application of Alabama's Wrongful Death Act, [one] necessarily resurrect[s] the same

---

**22.** In *Kalafut v. Gruver*, 239 Va. 278, 284, 389 S.E.2d 681, 684 (1990), the Supreme Court of Virginia indicated a child must be born alive to be able to recover regardless of whether the child is viable or not. "Thus, an action may be maintained for recovery of damages for any injury occurring after conception, provided the tortious conduct and the proximate cause of the harm can be established." 239 Va. at 284, 389 S.E.2d at 684.

In dictum in *Presley v. Newport Hospital*, 117 R.I. 177, 365 A.2d 748 (1976), the Supreme Court of Rhode Island indicated it would permit a cause of action for the wrongful death regardless of viability. However when directly confronted with the issue in *Miccolis v. AMICA Mut. Ins. Co.*, 587 A.2d 67 (R.I.1991), the court refused to allow the action.

**23.** Cases denying a cause of action on the basis of viability have been subject to overwhelming criticism. *See* Lingle, *supra;* Michael P. McCready, *Recovery for the Wrongful Death of a Fetus*, 25 U.Rich.L.Rev. 391 (1991); Symonds, *supra;* Meadows, *supra.* For a list of other authorities, see also *Gentry v. Gilmore*, 613 So.2d 1241, 1248–49 (Ala.1993). (Maddox, J., dissenting). Indeed, landmark decisions become landmark because they establish new, groundbreaking precedent. *See Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

**24.** *See Mace v. Jung*, 210 F.Supp. 706 (D.Alaska 1962); *Kandel v. White*, 339 Md. 432, 663 A.2d 1264 (1995); *Fryover v. Forbes*, 433 Mich. 878, 446 N.W.2d 292 (1989); *Wallace, supra; Miller v. Kirk*, 120 N.M. 654, 905 P.2d 194 (1995); *Guyer v. Hugo Pub. Co.*, 830 P.2d 1393 (Okla. App.1991); *Coveleski, supra; Miccolis, supra.*

distinctions that led to the adoption of wrongful death statutes in the first place." 613 So.2d at 1246. Justice Maddox further reasoned:

"'To deny a cause of action rewards tortfeasors who inflict fatal injuries upon nonviable fetuses, by allowing them to escape liability based upon what I think is an artificial distinction that focuses more on the status of the life that has been wrongfully terminated than upon the wrongful conduct that caused the death. Such a holding produces an anomalous result." 613 So.2d at 1246.

These common-sense principles as set forth by Justice Maddox apply equally as well to the death of a nonviable unborn child as they do to a nonviable unborn child who suffers a tortious injury and survives birth and a viable unborn child who suffers a tortious injury and dies en ventre sa mere. Wrongful death statutes, after all, are designed to provide economic compensation to the surviving family. When a family loses a potential member because of tortious conduct, it suffers an injury of the same order[25] as that which occurs when it loses an existing member. The statute allows recovery for the loss of a life that would have provided love and sustenance but for the intervening tort.

As this Court previously has held, W.Va. Code, 55–7–5, is remedial in nature and should be liberally construed. *Baldwin*, 155 W.Va. at 437, 184 S.E.2d at 431. In light of our previous interpretation of W.Va.Code, 55–7–5, and the goals and purposes of wrongful death statutes generally, we, therefore, hold that the term "person," as used in this statute and the equivalent language in its counterpart, W.Va.Code, 55–7–6 (1992),[26] encompasses a nonviable unborn child and, thus, permits a cause of action for the tortious death of such child.

We recognize that the closer one gets to the moment of conception, the more substantial becomes the potential for fraudulent claims and for increased difficulties in resolving some issues of causation and damages. However, those risks are no more of a justification to erect a bar to legitimate claims in this context than they were when we dismissed them as a reason for rejecting claims relating to viable unborn children in *Baldwin*. Moreover, our holding in this case eliminates the need for trial courts to decide what often could be an extremely difficult factual question, i.e., whether the fetus was "viable." For reasons stated above and in *Baldwin*, we also reject the argument that the legal question presented here should be left to the Legislature. Although we invite legislative direction on this matter, it is clear from the statute that the Legislature has not confronted the issue we must decide here, and, therefore, it is the duty of this Court to reach that decision which is most consistent with the purposes of the wrongful death law and which best comports with our sense of justice. We believe our holding meets that duty.

Several observations about today's decision are in order. Our definition of "person" within the confines of the wrongful death statute neither affects nor interferes with the constitutional protection afforded a woman who chooses to have an abortion, as was set forth originally in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).[27] The abortion question simply is not relevant to wrongful death. As Symonds, *supra* at 113 n. 68, stated, the United States Supreme Court in *Roe v. Wade* "limited its statement that an unborn child is not a person to the specific terms of the fourteenth amendment." (Citation omitted). Symonds then explained:

"[T]he decision to allow abortion does not depend on the same policies and justifications as does the decision to allow a cause of action for the wrongful death of a fetus. While the fetus may not be a 'person' for the purposes of the fourteenth amendment,

---

**25.** Concededly, the degree of bonding and love toward an unborn child may not be as great as that which would extend toward the deceased in the more typical wrongful death case. That fact, however, goes to the question of damages and not to actionability.

**26.** *See* note 1, *supra*.

**27.** *See also Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Webster v. Reproductive Health Serv.*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989).

684

it may be a 'person' for the purposes of a state's wrongful death statute. Furthermore, while a woman's right to privacy is the policy involved in the abortion decision, the policy that a tortfeasor should not escape liability is involved in the wrongful death decision. One decision does not solve the controversy of the other."

*See also* Lingle, *supra* at 490 ("recognizing a fetus as a 'person' for purposes of the Arkansas wrongful death statute does not run afoul of the decision in *Roe v. Wade,* nor should it be in conflict with the intent of the statute"); Meadows, *supra* at 112 n. 123 (given the different policies governing abortion and wrongful death decisions " 'it may be necessary to accept some inconsistency and conclude that prenatal life will be protected against intentional or negligent interference, *absent* some compelling countervailing interest' "), *quoting* David Kader, *The Law of Tortious Prenatal Death Since Roe v. Wade,* 45 Mo.L.Rev. 639, 660 (1980). (Emphasis in original)). *See generally Summerfield,* 144 Ariz. at 477–78, 698 P.2d at 722–23 (the Supreme Court of Arizona stated that the definition of "person" for purposes of the Fourteenth Amendment to the United States Constitution does not control the way the term may be interpreted in another context, i.e., a wrongful death statute).[28] To be clear, a wrongful death action will not lie against a woman who chooses to exercise her constitutional right to have an abortion.[29] By definition, if a woman has a constitutional right to decide whether to carry an unborn child to term or abort it, then the act of aborting is not tortious. In such cases, the reasons for invoking the wrongful death statute do not apply; there is no tortious conduct to deter.

Although we have answered the question presented to this Court given the current language in our wrongful death statute, we strongly encourage the Legislature to define the word "person" to deal with future problems that may arise—especially with regard to medical technology that now enables conception outside the mother's womb and preconception torts.[30] As stated in note 3, *supra,* this opinion is limited to an unborn child who is en ventre sa mere.

## V.

## SUMMARY

In conclusion, we find that a nonviable unborn child who is tortiously injured but, nevertheless, is born alive may maintain a cause of action. In addition, if death ensues as a result of a tortiously inflicted injury to a nonviable unborn child, the personal representative of the deceased may maintain an action pursuant to our wrongful death statute. Our decision is a limited one and is in no way intended to be contrary to the constitutional right of a woman to have an abortion. We, therefore, reverse the judgment of the Circuit Court of Wayne County and remand this case for further proceedings.

Reversed and Remanded.

MILLER, Retired Justice, sitting by temporary assignment.

ALBRIGHT, J., did not participate.

**28.** For the foregoing reasons, we disagree with those jurisdictions that appear to limit the use of the term "person" in wrongful death statutes to the United States Supreme Court's interpretation of "person" in the Fourteenth Amendment context. *See Justus,* 19 Cal.3d at 577–78, 139 Cal. Rptr. at 106, 565 P.2d at 131.

**29.** Similarly, we do not find that our determinations in a criminal context control our conclusions in a wrongful death context. *See State ex. rel. Atkinson v. Wilson,* 175 W.Va. 352, 355, 332 S.E.2d 807, 810 (1984) (recognizing "a distinction between a court's power to evolve common law principles in areas in which it has traditionally functioned, i.e., the tort law, and in those areas in which the legislature has primary or

plenary power, i.e., the creation and definition of crimes and penalties." In Syllabus Point 2, we stated: "Neither our murder statute, W.Va.Code, 61–2–1, nor its attendant common law principles authorize prosecution of an individual for the killing of a viable unborn child").

**30.** The Legislature should take such action after careful and reflective consideration of the complexities of the issue before it. Any legislation adopted must provide in *clear and plain language* the intent of the Legislature. For current examples of state legislation, see Ill.Ann.Stat. ch. 740, Civ.Liab. Act 180, para. 2.2 (Smith–Hurd 1995); S.D. Codified Laws Ann. § 21–5–1 (1984); Tenn. Code Ann. § 20–5–106(c) (1991).