# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## September 2019 Term

_____

No. 18-1112
_____

**MARWAN F. SALEH, M.D.,**
**Defendant Below, Petitioner**

**V.**

**ANGIE DAMRON, and**
**ROY CHADWICK DAMRON, HER HUSBAND, and**
**ANGIE DAMRON as the administratrix of**
**the estate of baby Damron,**
**Plaintiffs Below, Respondents**

_____

**Certified Questions from the United States District Court**
**for the Southern District of West Virginia**
**The Honorable Thomas E. Johnston, Chief Judge**
**Civil Action No. 2:18-cv-00442**

**CERTIFIED QUESTIONS ANSWERED**
_____

**Submitted: September 4, 2019**
**Filed: November 22, 2019**

**FILED**
**November 22, 2019**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

D.C. Offutt, Jr.
Matthew Mains
Offutt Nord, PLLC
Huntington, West Virginia
Attorneys for the Petitioner

Guy R. Bucci
Raj A. Shah
Eric R. Arnold
Hendrickson & Long, PLLC
Charleston, West Virginia
Arnold J. Ryan
Williamson, West Virginia
Attorneys for the Respondents

**JUSTICE JENKINS delivered the Opinion of the Court.**

**JUSTICE ARMSTEAD dissents and reserves the right to file a dissenting opinion.**

**SYLLABUS BY THE COURT**

1.      "A tortious injury suffered by a nonviable child en ventre sa mere who subsequently is born alive is compensable and no less meritorious than an injury inflicted upon a viable child who subsequently is born alive."  Syllabus point 1, *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995).

2.      "In light of our previous interpretation of W. Va. Code, 55-7-5, and the goals and purposes of wrongful death statutes generally, the term 'person,' as used in W. Va. Code, 55-7-5 (1931) and the equivalent language in its counterpart, W. Va. Code, 55-7-6 (1992), encompasses a nonviable unborn child and, thus, permits a cause of action for the tortious death of such child."  Syllabus point 2, *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995).

3.      The term "person" as used in the West Virginia Wrongful Death Statute, W. Va. Code §§ 55-7-5 and 55-7-6 (2016), does not include an ectopic embryo or an ectopic fetus.

**Jenkins, Justice:**

The United States District Court for the Southern District of West Virginia presents to this Court the following two certified questions:

> A. Does West Virginia recognize a cause of action for pre-conception torts, [which] is an action brought by or on behalf of a person for injuries alleged to have resulted from negligent acts or omissions [that] occurred prior to the person's conception?
>
> B. Does the term "person" as used in the West Virginia Wrongful Death Statute (W. Va. Code §§ 55-7-5 and 55-7-6)[,] and interpreted in the Supreme Court of Appeals of West Virginia's opinion in *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995), encompass an ectopic embryo/fetus?

We choose to answer Question B. Upon our consideration of the parties' briefs and oral arguments, the appendix record submitted, and the relevant legal authorities, we answer Question B in the negative and conclude that the term "person" as used in W. Va. Code §§ 55-7-5 and 55-7-6 (Lexis Nexis 2016), which are provisions of the West

1

Virginia Wrongful Death Statute, does not include an ectopic[1] embryo[2] or an ectopic fetus.[3]

Our answer to this question renders Question A moot.

# I.

## FACTUAL AND PROCEDURAL HISTORY

The relevant facts that aid in placing the issues herein raised in the proper context are undisputed. In 2013, Angie Damron ("Mrs. Damron"), a respondent to this proceeding and a plaintiff in the related action before the United States District Court for the Southern District of West Virginia ("the District Court"), was an obstetrics patient of Dr. Marwan F. Saleh ("Dr. Saleh"), the petitioner in the instant matter and the defendant in the related District Court action. On November 13, 2013, Mrs. Damron presented to the Logan Regional Medical Center in labor with her second child. Dr. Saleh delivered the child by cesarean section. In accordance with a prior discussion between Dr. Saleh and

---

[1] "Ectopic" is defined in relevant part as "[o]ut of place; said of . . . a pregnancy occurring elsewhere than in the cavity of the uterus." *Stedman's Medical Dictionary for the Health Professions and Nursing* 483 (6th ed. 2008).

[2] The "embryo" stage of prenatal development in humans is generally understood to encompass the third through eighth weeks of gestation. *See Taber's Cyclopedic Med. Dictionary* 788 (22d ed. 2013). "Embryo" also is defined "in humans [as] the stage of prenatal development from the time of fertilization of the ovum (conception) until the end of the eighth week." *Mosby's Med. Dictionary* 602 (9th ed. 2013).

[3] "Fetus" is, "[i]n humans, the product of conception from the end of the eighth week to the moment of birth." *Stedman's*, *supra* note 1, at 577. *See also Taber's*, *supra* note 2, at 914 (defining "fetus," in part, as "[t]he unborn human from the beginning of the ninth week, i.e., the third month, of gestation until birth").

Mrs. Damron during an office visit, and because Mrs. Damron desired to have no more children, Dr. Saleh contemporaneously performed a bilateral tubal ligation for permanent sterilization purposes.[4] Mrs. Damron and her newly born infant child subsequently were discharged from the medical center without complications.

Just over three years later, on December 23, 2016, Mrs. Damron sought treatment from the Emergency Department of the Beckley Appalachian Regional Hospital for symptoms that included abdominal pain, diarrhea, nausea, and vomiting. Testing performed at the hospital showed that Mrs. Damron had elevated levels of human chorionic gonadotropin ("HCG"), a chemical component of urine that indicates pregnancy.[5] An ultrasound was performed but no intrauterine pregnancy was found. The radiologist recommended a close follow-up to determine whether the HCG levels were an indication of early gestation or an ectopic pregnancy.[6] Mrs. Damron was discharged in the early

_____

[4] The Screening Certificate of Merit contained in the appendix record submitted in connection with this proceeding states that Mrs. Damron had requested sterilization during an office visit with Dr. Saleh.

[5] "HCG" or "human chorionic gonadotropin" is "a chemical component of the urine of pregnant women." *Mosby's*, *supra* note 2, at 358 (defining "chorionic gonadotropin" and acknowledging that it also is called "human chorionic gonadotropin"). *See also Stedman's*, *supra* note 1, at 305 (defining "chorionic gonadotropin" and explaining that "[t]esting for the beta fraction of human chorionic gonadotropin is the basis for most serum and urine pregnancy tests").

[6] It has been observed that,

> [e]ctopic pregnancy is a potentially life-threatening pregnancy in which implantation of the fertilized egg occurs outside the uterus. This condition can cause a woman to have

3

morning hours of December 24, 2016, with instructions to return for a repeat evaluation of her HCG level. Later that day, Mrs. Damron returned to Beckley Appalachian Regional Hospital to again have her HCG levels measured. Additional testing revealed a live ectopic pregnancy located in Mrs. Damron's left fallopian tube. The gestational age of the embryo was estimated to be between six weeks one day, and six weeks four days; a heart rate of 142 beats per minute also was noted. The parties agree that this ectopic pregnancy, which was located in Mrs. Damron's fallopian tube, had no chance of resulting in a live birth[7] and, if allowed to continue, would result in Mrs. Damron's death.[8] Due to the certainty that continuation of this pregnancy would result in Mrs. Damron's death, she was admitted

massive, rapid bleeding, and even die. Ectopic pregnancies are the second leading cause of pregnancy related deaths during the first trimester and represent 9 percent of all pregnancy related deaths in the nation. It is estimated that 100,000 ectopic pregnancies occur each year.

Louis J. Palmer, Jr. & Xueyan Z. Palmer, *Encyclopedia of Abortion in the United States* 132 (2d ed. 2009). *See also Stedman's*, *supra* note 1, at 483 (defining "ectopic pregnancy" as "[t]he development of an impregnated ovum *outside the cavity of the uterus*." (emphasis added)). Mrs. Damron's ectopic pregnancy was a tubal pregnancy insofar as the conceptus implanted in her left fallopian tube.

[7] The Damrons concede in their brief to this Court that the ectopic embryo "was destined to die," and state that their Certificate of Merit "recognized this certain death." Likewise, Dr. Saleh declares in his brief that "[i]t is beyond contention that an ectopic embryo or [ectopic] fetus will never give rise to a live birth." Even the District Court's order of certification to this Court comments that "[t]he parties agree that an ectopic pregnancy can never result in a live birth."

[8] *See supra* note 6.

4

to the hospital and underwent a left salpingectomy, *i.e.*, removal of the ectopic embryo. She was discharged on December 26, 2016.

Thereafter, Mrs. Damron, on behalf of herself and as the administratrix of the estate of her ectopic embryo, designated by her as "Baby Damron" ("the ectopic embryo"), and her husband Roy Chadwick Damron (collectively "the Damrons"), filed suit against Dr. Saleh in the District Court. Their complaint asserts two claims. In "Count I" of the complaint, Mrs. Damron asserts a claim of medical professional liability alleging that Dr. Saleh failed to provide her with sufficient information to obtain her informed consent to have a bilateral tubal ligation. Specifically, Mrs. Damron contends that Dr. Saleh was negligent and violated the standard of care by not advising her of the failure rate of the sterilization procedure and of the associated increased risk of an ectopic pregnancy.[9] This claim is not related to either of the questions certified to this Court by the District Court, and it will not be impacted by our answer.

In "Count II" of the complaint, the Damrons assert a claim of wrongful death, pursuant to W. Va. Code §§ 55-7-5 and 55-7-6, on behalf of the ectopic embryo. Under this claim, which is directly related to the questions herein certified, the Damrons allege

---

[9] In relation to "Count I" of the amended complaint, Mrs. Damron seeks the following damages: medical and hospital costs; emotional distress; pain and suffering; mental anguish; loss of ability to enjoy life; and loss of a bodily organ system and permanent and substantive physical deformity.

5

that Dr. Saleh's failure to properly inform Mrs. Damron of the risks that the tubal ligation procedure could fail, of the increased risk of an ectopic pregnancy following a tubal ligation, and that a tubal ectopic pregnancy would result in the certain death of the ectopic embryo, was the proximate cause of Mrs. Damron's left tubal ectopic pregnancy and the resulting death of the ectopic embryo.[10]

Dr. Saleh filed a motion for partial dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asking the District Court to dismiss "Count II" of the complaint for failure to state a claim upon which relief can be granted. The Damrons sought leave to file an amended complaint,[11] and filed a response to Dr. Saleh's motion for partial dismissal. The District Court granted the Damrons' motion for leave to amend their complaint, took Dr. Saleh's motion for partial dismissal under advisement, and directed the parties to submit a proposal for certified questions. By order entered on December 18, 2018, the District Court certified the following two questions to this Court for resolution:

> A. Does West Virginia recognize a cause of action for pre-conception torts, [which] is an action brought by or on behalf of a person for injuries alleged to have resulted from negligent acts or omissions [that] occurred prior to the person's conception?

[10] In connection with "Count II" of their amended complaint, the Damrons seek the following damages: grief, sorrow and mental anguish resulting from the death of the ectopic embryo; loss of society, companionship, comfort, guidance, kindly offers and advice; loss of protection, care and assistance; and medical expenses.

[11] The Damrons' amended complaint asserted the same two claims against Dr. Saleh, but modified some of the language used. For example, some references to the term "fetus" in the original complaint were replaced with the term "unborn child" in the amended complaint.

6

B. Does the term "person" as used in the West Virginia Wrongful Death Statute (W. Va. Code §§ 55-7-5 and 55-7-6)[,] and interpreted in the Supreme Court of Appeals of West Virginia's opinion in *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995), encompass an ectopic embryo/fetus?

This Court accepted the certified questions by order entered on February 7, 2019.

## II.

## STANDARD OF REVIEW

The instant proceeding is before this Court upon questions certified by the District Court. Accordingly, we observe that "'[a] de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court.' Syllabus Point 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998)." Syl. pt. 1, *Martinez v. Asplundh Tree Expert Co.*, 239 W. Va. 612, 803 S.E.2d 582 (2017). Stated another way, "[t]his Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court." Syl. pt. 1, *Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133, 522 S.E.2d 424 (1999). Following the foregoing standard for our consideration of this matter, we proceed to engage in plenary consideration of the dispositive legal issue raised by Question B.

## DISCUSSION

Although the District Court has certified two questions to this Court for resolution, we find that question B, the question that asks this Court to interpret the West Virginia Wrongful Death Statute, is dispositive of the legal issue herein raised and provides the necessary direction to the District Court as to the application of the Wrongful Death Statute for purposes of ruling on Dr. Saleh's motion for partial dismissal of the Damrons' amended complaint. Accordingly, we elect to limit our analysis solely to Question B. We decline to address Question A because we find it to be rendered moot as a result of our answer to Question B.

> Question B, as certified by the District Court, asks:
>
> Does the term "person" as used in the West Virginia Wrongful Death Statute (W. Va. Code §§ 55-7-5 and 55-7-6)[,] and interpreted in the Supreme Court of Appeals of West Virginia's opinion in *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995), encompass an ectopic embryo/fetus?

The certifying court did not propose an answer to this question.

Dr. Saleh urges this Court to answer the foregoing question in the negative. He contends that neither West Virginia law, federal law, nor law from other jurisdictions has recognized an ectopic embryo or an ectopic fetus as an unborn child upon whose behalf a wrongful death action may be brought. He recognizes that this Court has concluded that

a nonviable[12] unborn child is a "person" under West Virginia Code Sections 55-7-5 and 55-7-6. *See* Syl. pt. 2, *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995). However, he contends that the Court limited its holding to unborn children who are *en ventre sa mere*, or in the womb.[13]  *Id.* at 673 n.3, 466 S.E.2d at 524 n.3. Such a limitation necessarily excludes ectopic embryos or ectopic fetuses, which are, by definition, outside the womb.[14] Conversely, the Damrons argue that the language in *Farley* referring to a nonviable unborn child as *en ventre sa mere* is dicta and not controlling. Thus, they equate an ectopic embryo or ectopic fetus with a nonviable unborn child and argue that such a child meets the definition of the term "person" as used in West Virginia Code Sections 55-7-5 and 55-7-6.[15]

---

[12] The root term "viable" and its antonym "nonviable" have been explained as follows:

> It is at the point of "viability" that the fetus presumably has the capability of meaningful life outside the mother's womb. Thus, a fetus is "viable" if it is potentially able to live outside the mother's womb, albeit with artificial aid. In contrast, the term "nonviable" means not capable of living, growing, or developing and functioning successfully, the antithesis of viable. A "nonviable fetus" is incapable of living outside its mother's womb.

62A Am. Jur. 2d *Prenatal Injuries, Etc*. § 2 (2018) (footnotes omitted).

[13] Black's Law Dictionary defines the term "*en ventre sa mere*" as meaning "in the mother's womb." *Id.* 555 (7th ed. 1999).

[14] See *supra* notes 1 and 6 for definitions of "ectopic" and "ectopic pregnancy."

[15] However, the Damron's have cited no authority demonstrating that a wrongful death action on behalf of an ectopic embryo or an ectopic fetus has been permitted.

Insofar as our analysis requires the interpretation of statutory provisions, we pause to review some basic principles of statutory construction before delving into our discussion. First and foremost, we observe that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). In gleaning this Legislative intent, we "look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995). On the other hand, "[a] statute that is ambiguous must be construed before it can be applied." Syl. pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992).

Turing now to the West Virginia Wrongful Death Statute at issue, we observe that, pursuant to the relevant portion of W. Va. Code § 55-7-5,

> [w]henever the death of *a person* shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of *the person* injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter.

10

(Emphasis added).[16] Under W. Va. Code § 55-7-6(a), an action for wrongful death may be

brought "by and in the name of the personal representative of such deceased *person*."

(Emphasis added).[17] Clearly, under the plain language of the foregoing provisions, in order

---

[16] The full text of W. Va. Code § 55-7-5 (LexisNexis 2016) provides:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to murder in the first or second degree, or manslaughter. No action, however, shall be maintained by the personal representative of one who, not an infant, after injury, has compromised for such injury and accepted satisfaction therefor previous to his death. Any right of action which may hereafter accrue by reason of such injury done to the person of another shall survive the death of the wrongdoer, and may be enforced against the executor or administrator, either by reviving against such personal representative a suit which may have been brought against the wrongdoer himself in his lifetime, or by bringing an original suit against his personal representative after his death, whether or not the death of the wrongdoer occurred before or after the death of the injured party.

[17] The complete text of W. Va. Code § 55-7-6 (LexisNexis 2016) states:

> (a) Every such action shall be brought by and in the name of the personal representative of such deceased person who has been duly appointed in this State, or in any other state, territory or district of the United States, or in any foreign country, and the amount recovered in every such action shall be recovered by said personal representative and be distributed in accordance herewith. If the personal representative was duly appointed in another state, territory or district of the

11

United States, or in any foreign country, such personal representative shall, at the time of filing of the complaint, post bond with a corporate surety thereon authorized to do business in this State, in the sum of one hundred dollars, conditioned that such personal representative shall pay all costs adjudged against him or her and that he or she shall comply with the provisions of this section. The circuit court may increase or decrease the amount of said bond, for good cause.

(b) In every such action for wrongful death[,] the jury, or in a case tried without a jury, the court, may award such damages as to it may seem fair and just, and, may direct in what proportions the damages shall be distributed to the surviving spouse and children, including adopted children and stepchildren, brothers, sisters, parents and any persons who were financially dependent upon the decedent at the time of his or her death or would otherwise be equitably entitled to share in such distribution after making provision for those expenditures, if any, specified in subdivision (2), subsection (c) of this section. If there are no such survivors, then the damages shall be distributed in accordance with the decedent's will or, if there is no will, in accordance with the laws of descent and distribution as set forth in chapter forty-two [§§ 42-1-1 et seq.] of this code. If the jury renders only a general verdict on damages and does not provide for the distribution thereof, the court shall distribute the damages in accordance with the provisions of this subsection.

(c)(1) The verdict of the jury shall include, but may not be limited to, damages for the following: (A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; (B) compensation for reasonably expected loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent; (C) expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death; and (D) reasonable funeral expenses.

(2) In its verdict the jury shall set forth separately the amount of damages, if any, awarded by it for reasonable funeral, hospital, medical and said other expenses incurred as

12

to recover for wrongful death in West Virginia, the decedent must be a "person." However, the Legislature did not provide a specific definition of the term "person" for purposes of this statutory scheme. Thus, the absence of a definition has rendered the Wrongful Death Statute vague with respect to what is meant by the term "person" as used therein.

As the certified question acknowledges, this Court previously addressed the meaning of the term "person" in the context of an unborn child for purposes of the Wrongful Death Statute in *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522. However, the facts involved in *Farley* differ materially from those underlying the instant action. Factually, *Farley* involved a pregnant Mrs. Farley, who was between eighteen and twenty-

a result of the wrongful act, neglect or default of the defendant or defendants which resulted in death, and any such amount recovered for such expenses shall be so expended by the personal representative.

(d) Every such action shall be commenced within two years after the death of such deceased person, subject to the provisions of section eighteen [§ 55-2-18], article two, chapter fifty-five. The provisions of this section shall not apply to actions brought for the death of any person occurring prior to the first day of July, one thousand nine hundred eighty-eight.

two weeks gestation,[18] and who was killed, along with her nonviable[19] unborn child, in an automobile collision.[20] Mrs. Farley's husband, who also was the administrator of the estate of his deceased unborn child, brought a wrongful death action on behalf of the nonviable unborn child. The trial court granted the defendant's motion for summary judgment, with prejudice, based upon the evidence that the unborn child was not yet viable at the time of death.

The issue before the *Farley* Court on appeal was "whether viability is the appropriate criterion to determine whether an unborn child is a 'person' within the context of W. Va. Code, 55-7-5." *Id.* at 673, 466 S.E.2d at 524 (footnote omitted). In order to resolve this issue, the Court in *Farley* first surveyed the history and development of wrongful death actions generally and with respect to prenatal torts. The Court observed

---

[18] The *Farley* Court explained that "Mrs. Farley was probably eighteen weeks and a few days pregnant when calculated from the date of the first day of her last menses, although she could have been as far along as twenty-two weeks pregnant." *Farley v. Sartin*, 195 W. Va. 671, 672, 466 S.E.2d 522, 523 (1995) (footnote omitted). In this respect, Mrs. Farley's doctor "indicated that the gestational age of Baby Farley was an estimate because more accurate testing is not performed on a normal pregnant woman until her twentieth week of pregnancy and Mrs. Farley had not reached that point when calculated from her last menses." *Id.* at 672 n.2, 466 S.E.2d at 523 n.2.

[19] See note 12 *supra* for an explanation of the terms "viable" and "nonviable."

[20] Unlike the instant matter where the parties agree that the ectopic embryo had no chance of surviving, *see supra* note 7, Mrs. Farley's doctor concluded that "if Mrs. Farley had not been killed in the accident, he had 'no reason to believe that she would not have a normal pregnancy.'" *Id.* at 673, 466 S.E.2d at 524. Also unlike the case sub judice, Baby Farley clearly was in the womb.

that this area of jurisprudence had advanced to a point where, regardless of viability, "today, every jurisdiction permits recovery for prenatal injuries *if a child is born alive*." *Id.* at 677, 466 S.E.2d at 528 (emphasis added) (footnote omitted). Accordingly, the Court held that "[a] tortious injury suffered by a *nonviable child* en ventre sa mere who subsequently is born alive is compensable and no less meritorious than an injury inflicted upon a *viable child* who subsequently is born alive." Syl. pt. 1, *id.* (emphasis added).

Where the child was not born alive following a prenatal injury, though, the decision still commonly turned on viability. *Farley* recognized that "the majority of jurisdictions now do permit a wrongful death action *if the unborn child had reached the point of viability*." *Id.* at 677, 466 S.E.2d at 528 (emphasis added) (footnote omitted).[21] However, at the time *Farley* was decided, recovery for an injury to a nonviable unborn child where no live birth followed was permitted in a limited number of jurisdictions:

> With the exception of Georgia, which allows recovery after an unborn child is quick in the womb,[22] and Missouri, which

---

[21] *See also Restatement (Second) of Torts* § 869 at 82 Rep's. Note (Am. Law Inst., App. 1982) ("Most of the cases allowing recovery have involved a viable fetus."); 2 Dan B. Dobbs *et al.*, *The Law of Torts* § 366, at 471 (2d ed. 2011) ("Most courts . . . now recognize that an action lies for wrongful death of a stillborn infant or of a fetus not born alive, at least where the fetus was viable at the time or [sic] injury or became viable before stillbirth." (footnotes omitted)); Lori K. Mans, Note, *Liability for the Death of A Fetus: Fetal Rights or Women's Rights?*, 15 U. Fla. J.L. & Pub. Pol'y 295, 307 (2004) ("Most jurisdictions consider viability to be a controlling factor in determining whether an action for the wrongful death of a fetus is sustainable." (footnote omitted)).

[22] *See Shirley v. Bacon*, 267 S.E.2d 809, 810-11 (Ga. Ct. App. 1980) ("In Georgia an action for the wrongful death of an unborn child may be maintained if the child was 'quick' at its death (not at the time of injury). . . . The concept of 'quickening' is

15

found legislative direction to hold a nonviable child is a "person" under its wrongful death statute,[23] we are not aware of any other cases that permit recovery for injury prior to viability unless there is a live birth.

*Id.* at 681-82, 466 S.E.2d at 532-33 (footnotes omitted).[24] Nevertheless, the Court found

the rationale for allowing such a cause of action to be persuasive and ultimately held that,

defined as that point in time when the fetus is able to move in its mother's womb." (quotations and citations omitted)).

[23] *See Connor v. Monkem Co.*, 898 S.W.2d 89, 93 (Mo. 1995) ("[W]e hold that a wrongful death claim may be stated for a nonviable unborn child[.]").

[24] Although the number of jurisdictions recognizing such a recovery is growing, it still is small. *See Mack v. Carmack*, 79 So. 3d 597, 611 (Ala. 2011) ("[W]e hold that the Wrongful Death Act permits an action for the death of a previable fetus."); *Wiersma v. Maple Leaf Farms*, 543 N.W.2d 787, 789 (S.D. 1996) ("[W]e conclude a cause of action exists in South Dakota for the wrongful death of a nonviable unborn child."); *Carranza v. United States*, 267 P.3d 912, 915 (Utah 2011) ("Utah Code section 78-11-6 allows an action for the wrongful death of an unborn child, beginning at conception. This decision is limited to the statute as it existed before its amendment in 2009[.]" (footnotes omitted)). One commentator also has observed that twelve states have adopted legislation to allow a wrongful death action on behalf of a previable fetus:

*See* Alaska Stat. §§09.55.585, 11.81.900 (2015) (permitting a wrongful death cause of action for an "unborn child" and defining "unborn child" as "a member of the species Homo sapiens, at any stage of development, who is carried in the womb."); Ark. Code Ann. §§16-62-102, 5-1-102 (2015) (defining unborn child as "offspring of human beings from conception until birth"); 740 Ill. Comp. Stat. 180/2.2 (2015) (stating that "[t]he state of gestation or development of a human being . . . at death, shall not foreclose maintenance of any cause of action . . . arising from the death of a human being caused by wrongful act, neglect or default."); Kan. Stat. Ann. §60-1901(2015) (stating, "the term 'person' includes an unborn child," and defining "unborn child" as "a living organism of the species homo sapiens, in utero, at any stage of gestation from fertilization to birth"); La. Civ. Code. Art. 26 (stating, "[a]n unborn child shall be considered as a natural

16

> [i]n light of our previous interpretation of W. Va. Code, 55-7-5, and the goals and purposes of wrongful death statutes generally, the term "person," as used in W. Va. Code, 55-7-5 (1931) and the equivalent language in its counterpart, W. Va. Code, 55-7-6 (1992), encompasses a nonviable unborn child and, thus, permits a cause of action for the tortious death of such child.

Syl. pt. 2, *Farley*, 195 W. Va. 671, 466 S.E.2d 522.

---

person for whatever relates to its interests from the moment of conception. If the child is born dead, it shall be considered never to have existed as a person, except for purposes of actions resulting from its wrongful death."); Mich. Comp. Laws. §§600.2922, 600.2922a (2002) (broadening wrongful death claims to individuals who commit a wrongful or negligent act against a pregnant individual that results in "physical injury to or death of the embryo or fetus"); Mo. Ann. Stat. §§537.080, 1.205 (broadening the rights of unborn children to apply "from the moment of conception until birth," and noting that unborn children have equal rights to any other person); Neb. Rev. Stat. §30-809 (including "an unborn child in utero at any stage of gestation" in the wrongful death statute); 63 Okla. Stat. §1-730, 12 Okla. Stat. §1053 (2015) (permitting wrongful death of an unborn child and defining unborn child as "offspring of human beings from the moment of conception"); S.D. Codified Laws §21-5-1 (2015) (permitting a wrongful death cause of action for an "unborn child"); Tex. Civ. Prac. & Rem. Code §71.002 (defining "individual" in a wrongful death action as "an unborn child at every stage of gestation"); Va. Code. Ann. §§8.01-50, 32.1-249 (permitting a cause of action for fetal death, and defining "fetal death" as a death prior to expulsion from the mother "regardless of the duration of pregnancy").

Erika L. Amarante & Laura Ann P. Keller, *Dramatically Different Thresholds: Wrongful Death Before Birth*, 61 No. 5 DRI For Def. 30 (May 2019).

The Damrons now ask this Court to extend the right to bring a cause of action for wrongful death beyond what was recognized in *Farley* and to allow such a claim on behalf of an ectopic embryo that, as the parties agree, had no chance of resulting in a live birth.[25] We find no statutory or common law support for such an extension of the law. First, in *Farley*, the Court stated, twice, that its decision was limited to children who were en ventre sa mere (in the womb), which necessarily excludes an ectopic embryo or an ectopic fetus. *See id.* at 673 n.3, 466 S.E.2d at 524 n.3 ("We . . . explicitly limit this holding to unborn children who are en ventre sa mere[.]"); *Id.* at 684, 466 S.E.2d at 535 ("[T]his opinion is limited to an unborn child who is en ventre sa mere."). Even though this statement, as dicta, is not binding upon this Court, it is, nevertheless, a signal that the Court intended its holding to extend only to children in the womb.[26]

In addition, the *Farley* Court "strongly encourage[d] the Legislature to define the word 'person' to deal with future problems that may arise[.]" *Id.* at 684, 466 S.E.2d at 535. Nearly twenty-five years has passed since this Court encouraged the Legislature to define the term "person" for purposes of the Wrongful Death Statute, and no such definition has been provided. Thus, we must assume that our decision in *Farley* correctly interpreted

---

[25] *See supra* note 7.

[26] In making these statements, the *Farley* Court also declined to address issues involving advances in medical technology that enabled conception outside the womb. However, these statements do not change the fact that, according to the Court, its "opinion is limited to an unborn child who is en ventre sa mere." *Farley*, 195 W. Va. at 684, 466 S.E.2d at 535.

the Legislature's intent that the meaning of the term "person" for purposes of the Wrongful Death Statute includes only a child that is en ventre sa mere or in the womb.  *See*, *e.g.*, *Sostaric v. Marshall*, 234 W. Va. 449, 462, 766 S.E.2d 396, 409 (2014) (Davis, C.J., dissenting) ("[I]t may be presumed that the Legislature agreed with this Court's interpretation of the governing law in [*Fayette County National Bank v. Lilly*, 199 W. Va. 349, 484 S.E.2d 232 (1997), *overruled by Sostaric*, 234 W. Va. 449, 766 S.E.2d 396,] insofar as it declined this Court's invitation to amend the governing statutory law which has been in place for the past ninety-one years.").

Notably, while the Legislature has failed to provide a definition for the term "person" in relation to the Wrongful Death Statute, it has provided definitions for an embryo or a fetus in two other portions of the West Virginia Code.  *See* W. Va. Code § 16-2M-2 (LexisNexis 2016); W. Va. Code § 61-2-30 (LexisNexis 2014).  Both of the foregoing statutes expressly require the fetus or embryo to be either "in the uterus" or "in the womb."  The Pain-Capable Unborn Child Protection Act defines the term "fetus" as "the developing young *in the uterus*, specifically the unborn offspring in the postembryonic period from nine weeks after fertilization until birth."  W. Va. Code § 16-2M-2 (emphasis added).  Likewise, in the Unborn Victims of Violence Act, the Legislature has provided

definitions of "embryo"[27] and "fetus"[28] that do not expressly reference the womb, but then included that requirement in giving effect to those definitions as follows:

> For purposes of enforcing the provisions of sections one [§ 61-2-1], four [§ 61-2-4] and seven [§ 61-2-7] of this article, subsections (a) and (c), section nine [§ 61-2-9] of said article, sections ten [§ 61-2-10] and ten-b [§ 61-2-10b] of said article and subsection (a), section twenty-eight [§ 61-2-28] of said article, a pregnant woman and the embryo or fetus she is carrying *in the womb* constitute separate and distinct victims.

W. Va. Code § 61-2-30(c) (emphasis added). While not controlling, we find these provisions indicative of how the Legislature would define the terms "embryo" and "fetus" in relation to the Wrongful Death Statute.

We also take note that no jurisdiction has allowed a wrongful death action to be brought on behalf of an ectopic embryo or an ectopic fetus. Furthermore, of the jurisdictions that allow a wrongful death action on behalf of a nonviable unborn child, several expressly limit recovery to only a child who was *in the womb*. *See* Alaska Stat. § 09.55.585 (2018) & § 11.81.900 (2018) (allowing parent to maintain action for wrongful death of unborn child defined as "a member of the species Homo sapiens, at any stage of

---

[27] *See* W. Va. Code § 61-2-30(b)(1) (LexisNexis 2014) ("'Embryo' means the developing human in its early stages. The embryonic period commences at fertilization and continues to the end of the embryonic period and the beginning of the fetal period, which occurs eight weeks after fertilization or ten weeks after the onset of the last menstrual period.").

[28] *See* W. Va. Code § 61-2-30(b)(2) ("'Fetus' means a developing human that has ended the embryonic period and thereafter continues to develop and mature until termination of the pregnancy or birth.").

development, *who is carried in the womb*" (emphasis added)); Kan. Stat. § 60-1901(c) (Supp. 2016) (defining "unborn child" for purposes of wrongful death statute as including "a living individual organism of the species homo sapiens, *in utero*, at any stage of gestation from fertilization to birth" (emphasis added)); Neb. Rev. Stat. § 30-809 (2016) (allowing cause of action for wrongful death of "a person, including an unborn child *in utero* at any stage of gestation" (emphasis added)); *Stinnett v. Kennedy*, 232 So. 3d 202, 214 (Ala. 2016) ("We cited the protection in the Homicide Act of unborn children *in utero*, regardless of viability, as a justification for our holding that the Wrongful Death Act, in fact, permits a cause of action for the death of a previable fetus." (emphasis added)); *Shirley v. Bacon*, 267 S.E.2d at 810-11 ("In Georgia an action for the wrongful death of an unborn child may be maintained if the child was 'quick' at its death (not at the time of injury). . . . The concept of 'quickening' is defined as that point in time when the fetus is able to move *in its mother's womb*." (emphasis added) (additional quotations and citations omitted)).

Accordingly, we now hold that the term "person" as used in the West Virginia Wrongful Death Statute, W. Va. Code §§ 55-7-5 and 55-7-6 (LexisNexis 2016), does not include an ectopic embryo or an ectopic fetus. Applying this holding, we answer Question B, as certified by the District Court, in the negative.

## IV.

## CONCLUSION

Based upon the foregoing analysis, we answer the questions certified by the District Court as follows:

> B. Does the term "person" as used in the West Virginia Wrongful Death Statute (W. Va. Code §§ 55-7-5 and 55-7-6)[,] and interpreted in the Supreme Court of Appeals of West Virginia's opinion in *Farley v. Sartin*, 195 W. Va. 671, 466 S.E.2d 522 (1995), encompass an ectopic embryo/fetus?

**ANSWER:** No. The term "person" as used in the West Virginia Wrongful Death Statute, W. Va. Code §§ 55-7-5 and 55-7-6 (LexisNexis 2016), does not include an ectopic embryo or an ectopic fetus.

> A. Does West Virginia recognize a cause of action for pre-conception torts, [which] is an action brought by or on behalf of a person for injuries alleged to have resulted from negligent acts or omissions [that] occurred prior to the person's conception?

**ANSWER:** Certified Question A has been rendered moot by the Court's Answer to Certified Question B.

Certified Questions Answered.

22